1
2
3
4
5
6
7
8                        **IN THE UNITED STATES DISTRICT COURT**

9                     **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10
11   DONDI VAN HORN,                         CASE NO. CV F 08-1622 LJO DLB

12                    Plaintiff,             **ORDER ON DEFENDANT MADERA**
                                             **COMMUNITY HOSPITAL'S**
13                                           **MOTION FOR SUMMARY JUDGMENT**
            vs.
14
     TINA HORNBEAK, et al,
15
                     Defendants.
16   _____/

17        By amended notice filed on December 29, 2009, Defendant Madera Community Hospital

18   ("MCH") seeks summary judgment or in the alternative summary adjudication pursuant to Fed.R.Civ.P.

19   56 on the Fourth Cause of Action for Professional Negligence, the Sixth Cause of Action for Wrongful

20   Death, and the Seventh Cause of Action for Deliberate Indifference pursuant to 42 U.S.C. §1983.

21   Plaintiff Dondi Van Horn ("Van Horn") filed an opposition on February 4, 2010. Defendant MCH filed

22   a reply.[1] Pursuant to Local Rule 230(g), this matter is submitted on the pleadings without oral argument.

23   Therefore, the hearing set for February 18, 2010 is VACATED. Having considered the moving,

24   opposition, and reply papers, as well as the Court's file, the Court issues the following order.

25
26
27   _____

28        [1] The majority of the papers filed in support of and in opposition to this motion have been sealed. The Court finds
     that plaintiff has placed her medical condition in issue and therefore, this order will not be sealed.

                                                   1

**BACKGROUND**

**A.    Overview of Plaintiff's Medical Condition**

On July 31, 2007, Ms. Van Horn entered Valley State Prison for Women ("VSPW") inmate when she was 34 weeks pregnant.  Plaintiff alleges that during her incarceration and pregnancy, the national standard of care provided that pregnant women should be tested between the 35th and 37th weeks of pregnancy for Group B Streptococcus, a bacterium ("GBS"). (Fourth Amended Complaint "FAC" ¶¶18-21.)  Before delivery and while incarcerated, plaintiff visited the doctors at VSPW and Madera Community Hospital at least four times, but was never tested for GBS. (FAC ¶ 22-40.)  On August 26, 2007, at full term pregnancy, Ms. Van Horn delivered her son by cesarean section.  Her son's condition deteriorated rapidly, and he died in the late evening of August 27, 2007.

**B.    MCH's GBS Prevention Policy, the CDC guidelines and ACOG**

MCH is a "not for profit" general medical and surgical hospital with about 106 hospital beds and 20 Emergency Department beds. (John Frye Decl.¶2.)  MCH provides general medical and surgical care, general intensive care, pediatric medical and surgical care, obstetrics, labor and delivery, orthopedics and emergency medicine.  (John Frye Decl.¶3.)

At the time of plaintiff's admission, MCH had in place a GBS Prevention Policy (MCH Prevention policy"). (Dr. Reingold Decl.¶10(a).)  The MCH Prevention policy had been most recently revised in July of 2005 and was based upon the 2002 Center for Disease Control ("CDC") guidelines for the prevention of GBS disease.  Plaintiff acknowledges that the 2002 CDC guidelines are, in part, the standard of care.  (FAC ¶23 ("The CDC and ACOG [American College of Obstetricians and Gynaecologist] guidelines on GBS represent the accepted standard of care for all pregnant women.")  The CDC guidelines recommend GBS testing or screening be done during pregnancy between 35 to 37 weeks gestation as part of a mother's normal prenatal care.  (Reingold Decl. ¶13(a); Michael Nageotte, M.D. Decl. ¶27(a).)  Risk factors for GBS include a previous history of GBS, earlier positive GBS culture, gestational age of less than 37 weeks, a temperature during labor of 100.4 Fahrenheit or ruptured membranes for greater than 18 hours. (Arthur Reingold, M.D. Decl. ¶13(g) (stating CDC guidelines).)  The treatment for GBS is with Intrapartum Antimicrobial Prophylaxis ("IAP"). (Arthur Reingold, M.D. Decl. ¶13(h).)  MCH's experts testify that the "MCH's GBS Prevention policy was within the standard

of care and in accordance with the CDC and ACOG guidelines for GBS." (Michael Nageotte, M.D. Decl. ¶26; Arthur Reingold, M.D. Dec. ¶11("Policy . . . was consistent with the guidelines prescribed by the CDC and even the ACOG".)) The MCH Prevention policy applied to pregnant patients who had been admitted to MCH for delivery. (Dr. Reingold Decl.¶10(a).) MCH's Prevention policy and the CDC guidelines did not require screening, testing, or treatment for GBS for acute care visits, as compared with prenatal care. (Reingold Decl. ¶13(f).)

The CDC guidelines for GBS testing and prevention were adopted by the American College of Obstetricians and Gynaecologist ("ACOG") in December 2002. (Cardwell M.D. Decl. ¶14.) According to plaintiff's expert, ACOG identified additional risk factors which should be considered in tandem with the identified risk factors in the CDC guidelines. These additional risk factors include (1) inadequate prenatal care; (2) black race; (3) Hispanic ethnicity, and (4) maternal age less than 20 years. (*Id.)* ACOG recommended that physicians use these additional risk factors to identify women whom may not have the specified risk factors identified in the CDC guidelines but still have a risk of being infected with GBS. (*Id.*)

## C.    Medical Records for Plaintiff's Visits to MCH

Plaintiff was transported from VSPW to MCH on four separate occasions with complaints arising from her pregnancy. A summary of the visits is as follows. Plaintiff was first seen on August 4, 2007 at the MCH Emergency Department for complaints of pressure in the lower pelvis and back pain.[2] (Nageotte Decl. ¶19(d).) Dr. Siddiqi was the obstetrician who saw plaintiff on August 4, 2007 at MCH. Plaintiff was monitored for the GBS risk factors according to the CDC guidelines and MCH's Prevention Policy. Dr. Siddiqi determined plaintiff was not in active labor and did not need to be admitted into MCH.

Plaintiff was seen at MCH again at the Emergency Department on August 20, 2007. (Reingold Decl. ¶13(g).) Dr. Dhillon was the obstetrician who saw plaintiff on August 20, 2007. Plaintiff was monitored for the GBS risk factors according to the CDC guidelines and MCH's Prevention Policy. Dr.

---

[2] During each of her visit, plaintiff signed a "Conditions of Admission to Madera County Hospital," which provides in relevant part that all physicians and surgeons furnishing services to plaintiff are independent contractors and are not employees or agents of MCH. (Doc. SUMF 12.) As stated *infra* in this order, MCH argues that it is not vicariously liable for the conduct of Drs. Siddiqi and Dhillon because they are independent contractors.

Dhillon determined plaintiff was not in active labor and did not need to be admitted into MCH.

On August 21, 2007, plaintiff was transferred again from VSPW to MCH and seen at the Emergency Department. (Reingold Decl. ¶13(h).) Plaintiff was monitored for the GBS risk factors according to the CDC guidelines and MCH's Prevention Policy. Dr. Dhillon again was the obstetrician who saw plaintiff on August 21, 2007 and determined plaintiff was not in active labor and did not need to be admitted into MCH.

On August 26, 2007, plaintiff was transported from VSPW to MCH. Plaintiff was monitored for the GBS risk factors according to the CDC guidelines and MCH's Prevention Policy. The obstetrician at that time was Dr. Dhillon. Dr. Dhillon determined that plaintiff was in labor and accordingly issued an order on or about 3:20 a.m that plaintiff should be admitted to MCH for delivery. Plaintiff's GBS test results were not available for MCH or Dr. Dhillon on her delivery date of August, 2007, and were thus "unknown." (MCH SUMPF 32.) Madera contends she nonetheless did not meet the criteria established by either ACOG or the CDC, which criteria is incorporated into the MCH's GBS Prevention Policy. After plaintiff failed to progress in labor on August 26, 2007, plaintiff underwent a primary low transverse cesarean section. Her baby died on August 27, 2007.

**D.     Challenged Causes of Action**

Plaintiff contends that MCH was negligent in failing to screen for the GBS bacteria, to test for this bacteria, to recognize that Plaintiff had the bacteria, and thereafter, to treat the bacteria and/or possible infection during Plaintiff's prenatal care, labor and delivery. Defendant MCH is named in the following causes of action:

-     Fourth Cause of Action for Professional Negligence

-     Sixth Cause of Action for Wrongful Death

-     Seventh Cause of Action for Deliberate Indifference pursuant to 42 U.S.C. §1983.

MCH challenges each of these causes of action in this motion.

## ANALYSIS AND DISCUSSION

**A.     Summary Judgment/Adjudication Standards**

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment/adjudication is appropriate when there exists no genuine

4

issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law. F.R.Civ.P. 56( c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56 ( c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no

5

obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d at 574. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## B.    The Fourth Cause of Action for Professional Malpractice

MCH argues that it is entitled to summary judgment on the Fourth Cause of Action for Professional Negligence because MCH at all times met or exceeded the applicable standard of care.  It argues that MCH had no duty to screen or treat plaintiff for GBS.  GBS screening is recommended in a narrow window. When plaintiff was first seen on August 1, 2007 at MCH, she was 34 weeks pregnant - outside of the window for screening.  When plaintiff delivered on August 26, 2007, she was between 38 and 39 weeks pregnant."  (FAC ¶42.)  (Moving papers p.12.) MCH argues that it followed CDC guidelines and its own GBS Prevention Policy in handling plaintiff's labor and delivery of her baby. (MCH Moving papers p.11.)  MCH followed a GBS prevention policy for situations where no GBS screening results were available or were unknown prior to delivery.  There were no screening results available prior to plaintiff's delivery on August 26, 2007.  In accordance with CDC guidelines, MCH's

Prevention policy provides that if GBS screening results are missing at delivery, antibiotics should be administered only if the patient has one of several GBS transmission risk factors. (Moving papers p. 13.) Plaintiff did not have the risk factors.

The elements a plaintiff must prove for a negligence action based on medical malpractice are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Johnson v. Superior Court*, 143 Cal.App.4th 297, 305, 49 Cal.Rptr.3d 52 (2006); *Hanson v. Grode*, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999). "The standard of care in a medical malpractice case requires that medical service providers exercise ... that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." *Barris v. County of Los Angeles*, 20 Cal.4th 101, 108 n. 1, 83 Cal.Rptr.2d 145, 972 P.2d 966 (1999), *cert. denied*, 528 U.S. 868 (1999). "Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson." *Johnson*, 143 Cal.App.4th at 305, 49 Cal.Rptr.3d 52; *Alef v. Alta Bates Hosp.*, 5 Cal.App.4th 208, 215, 6 Cal.Rptr.2d 900, 904 (1992) (physicians and nurses subject to separate standards of care).

### 1. Experts' Declarations

Both parties present expert declarations from qualified experts who opine on the standard of care as well as the other elements of the professional negligence cause of action. The pertinent testimony of the experts is as follows.

### a. MCH's Experts

MCH argues that the standard of care, and the CDC guidelines, did not require MCH to screen or treat plaintiff for GBS. MCH relies upon three experts: Arthur L. Reingold, M.D., Michael P. Nageotte, M.D. and Heidi M. Funk, MS, RNC. Arthur L. Reingold, M.D. obtained is medical degree in 1976 and is a physician and epidemiology professor in the field of infectious diseases, such as GBS, at the School of Public Health at U.C. Berkeley. (Reingold Decl. ¶1.) Michael Nageotte, M.D., a

physician since 1976, is Board certified in Obstetrics/Gynecology since 1984 and in Maternal Fetal Medicine since 1985. He is in charge of obstetrical matters at Mille children's Hospital at Long Beach Memorial Medical Center and who is an expert in the field of obstetrical care. (Nageotte Decl. ¶1.) MCH also relies upon the declaration of Heidi Funk, MS, RN, CNS, a registered nurse who is an expert in maternal/child health care.[3] All three experts opine that the standard of medical care requires GBS screening be conducted during routine prenatal care, and not during the acute/urgent care visits plaintiff made to MCH. MCH contends, and all three experts agree, that each visit by plaintiff, on August 4, 20, 21 and 26, 2007 (pre-admission) were visits for urgent or acute care, not routine prenatal care. The experts opine that VSPW was exclusively responsible for plaintiff's prenatal care such as GBS screening. They also opine that plaintiff did not met the CDC criteria for GBS treatment. (MCH moving papers p.12:7-10.) Each of the experts testify that MCH met the standard of care in this case and MCH's conduct did not breach the standard of care. Each of the experts testify that they reviewed and relied upon the hospital and medical records in the case.

In particular, **Dr. Nageotte** testifies that GBS screening and treatment standard of care is stated in policies such as the CDC Recommendation and Report from August 16, 2002 (Prevention of Perinatal Group B Streptococcal Disease) and the 2002 ACOG opinion. (Nageotte Decl. ¶12.) He states that the MCH Prevention policy was within the standard of care and in accordance with the CDC and ACOG guidelines for GBS. Dr. Nageotte testifies that the MCH Prevention policy is consistent with and in accordance with the CDC guidelines for testing and treatment of GBS with IAP which state: unless a patient is less than 37 weeks gestation, unless temperature is elevated 100.4 degrees, unless the patient has had a history of GBS in previous infants, or if she has ruptured membranes for more than 18 hours, no treatment is required. (Nageotte Decl. ¶27(u).) The MCH Prevention policy pertains to patients who are in labor and are being admitted to MCH for delivery; the policy is not for patients seen in the Emergency Department. (Nageotte Decl. ¶27(h).) Dr. Nageotte testifies that the standard of care does not require that patients seen in the Emergency Department of a hospital, such as MCH, for an obstetrical check to be tested or screened for GBS. (Nageotte Decl. ¶27(i).) Dr. Nageotte testifies that

---

[3] Plaintiff does not assert any challenge to the professional qualifications of these experts to render their opinions.

on each of August 4, 20, and 21 visits to the Emergency Department, plaintiff's medical records show that she did not meet any of the criteria for treatment of GBS with IAP. At plaintiff's August 26, 2007, admission for delivery, plaintiff was assessed for possible GBS treatment, but did not meet the criteria for treatment with IAP. (Nageotte Decl. ¶27(v).) Dr. Nageotte opines that the standard of care does not require MCH to treat a patient when the GBS status is "unknown" because the CDC guidelines require treatment if the risk factors are present. (Nageotte Decl. ¶27(y).) The standard of care does not require treatment with IAP when the GBS status is unknown.

**Dr. Reingold** similarly testifies that the MCH's GBS Prevention policy applied to pregnant patients that had been admitted to MCH for delivery. He states the MCH Prevention policy in August 2007 was reasonable, proper, appropriate and was consistent with the guidelines prescribed by the CDC and ACOG. Dr. Reingold testifies that during plaintiff's acute care visits to the Emergency Department at MCH, the GBS Prevention policy did not apply to plaintiff because she was not admitted by her treating physician. At these acute care visit, neither MCH's Prevention policy nor CDC guidelines required MCH to perform any type of GBS screening, testing or treatment for possible GBS. At these visits, plaintiff did not exhibit any of the risk factors for GBS treatment such as previous history of GBS, earlier positive GBS culture, gestational age of less than 37 weeks, or a temperature of 100.4 degrees. (Reingold Decl. ¶13.) Dr. Reingold opines that although plaintiff's GBS status was "unknown" at the acute care visits and admission for delivery, plaintiff did not have any other risk factors. As such, according to the CDC guidelines and MCH's own policy, IAP would not need to be administered. (Reingold ¶13(j).) Based upon his review of the medical records, he opines that "MCH both had an appropriate GBS Prevention policy in place and complied with said policy . . ." (Reingold ¶13.)

**Ms. Funk** testifies that the nursing staff acted within the standard of care for the treatment and care of plaintiff during her acute care visits to the Emergency Department on August 4, 20, 21 and 26 (before admission). (Funk Decl. ¶14.) She testifies that the standard of care does not require that MCH consider whether the patient had been receiving prenatal care at a prison. (Funk Dec. ¶15.)

### b. Plaintiff's Expert

Plaintiff presents the declaration of Michael Cardwell, M.D., who is a Board certified obstetrician-gynecologist and maternal fetal medicine specialist licensed in nine states. (Cardwell Decl.

9

¶1.) Dr. Cardwell states the CDC guidelines define the minium standard of care for GBS testing and treatment. Dr. Cardwell agrees that the CDC guidelines recommend universal prenatal screening of pregnant women at 35-37 weeks gestation, but disagrees that MCH did universal prenatal screening. He acknowledges that the CDC guidelines identify risk factors which would support use of IAP in the absence of a positive GBS test result. He agrees that these risk factors are preterm labor of less than 37 weeks; prolonged rupture of membrane greater than 18 hours, and maternal fever during labor of greater than 38 degrees Celsius. (Cardwell Decl. ¶12.) Dr. Cardwell states that the CDC guidelines where adopted by the ACOG which identified additional risk factors which should also be considered in tandem with the CDC guidelines: (1) inadequate prenatal care, (2) black race; (3) Hispanic ethnicity, and (4) maternal age less than 20 years. (Cardwell Decl. ¶14.)

Dr. Cardwell states that the standard of care also requires a physician who sees a patient for acute or emergency care during the 35-37 gestation period, to perform GBS screening if the physician is aware the patient is unlikely to have a routine appointment during the key gestation period. Dr. Cardwell states that "[w]hile the national standard dictates that screening must occur between 35-37 weeks gestation, if a physician is aware that the GBS screening has not occurred during that period, even after the 37th wee [sic], he is responsible for performing the GBS testing at any time before delivery." (Cardwell Decl. ¶20.) Dr. Cardwell states that the standard of care requires screening for GBS if a patient presents during the relevant 35-37 week gestation period and the GBS status is "unknown." (Cardwell Decl. ¶36.)

As to whether MCH performed to the standard of care, Dr. Cardwell states that MCH's Prevention policy and related policies were inadequate. MCH's Prevention policy failed to address the additional risk factors identified by ACOG. MCH failed to have appropriate policies in place and require that prenatal records and laboratory testing results be obtained and consulted for proper acute or routine treatment. (Cardwell Decl. ¶¶22-26.) Dr. Cardwell opines that without adequate record-keeping or review, MCH and staff cannot follow its GBS policies. (Cardwell Decl. ¶¶28.)

### 2. The Dispute over the Standard of Care

Here, the parties dispute the standard of care applicable to defendant MCH. The parties do not dispute that the CDC guidelines provide a standard of care. The parties dispute whether the standard

of care requires more than or in addition to what is stated in the CDC guidelines.

"California courts have incorporated the expert evidence requirement into their standard for summary judgment in medical malpractice cases. When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." *Hanson*, 76 Cal.App.4th at p. 607 (emphasis added).

Here, the experts are conflicting as to the standard of care. MCH's experts state that the CDC guidelines are the applicable standard of care. Plaintiff's expert, Dr. Cardwell, opines that the CDC guidelines are the minimum standard and that those minimum standards include the risk factors identified by ACOG. Plaintiff's expert also asserts that the standard of care includes testing for GBS during the 35-37 gestation period if the treating physician has a reasonable expectation that the patient may not be tested during the 35-37 week period, regardless of whether the patient is seen for acute or emergency care. Plaintiff's expert asserts the standard of care includes "proximity" to the 35-37 week testing period.

This dispute over the standard of care raises a genuine issue of fact which precludes summary judgment. Each party presents experts who have differing standards and justification for the applicable standard of care. The evidence establishes that if MCH's experts are believed as to the standard of care - the CDC guidelines - then MCH may not have fallen below the standard of care. MCH's conduct, according to its experts, met the standard of care. On the other hand, if plaintiff's evidence is believed that the CDC guidelines, plus assessing additional risk factors and other criteria (as detailed in Dr. Cardwell's declaration) are the standard of care, MCH's conduct fell below the standard of care. This evidence conflicts as to the proper standard of care and whether the standard of care has been breached. Factual questions such as this cannot be resolved on summary judgment. Issues of credibility should be left to the jury. *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985).

In its reply brief, MCH argues that the standard of care for the hospital is different from the standard of care for physicians. (MCH Reply p. 6-7.) MCH argues that plaintiff confuses and "conflates the duties of the hospital with irrelevant duties of the physician." (MCH Reply p.7.) MCH argues that plaintiff confuses the respective duties of hospitals (to provide reasonable broadly-applicable policies

11

and procedures) with that of physicians (to make patient-specific treatment decision).

The Court, however, cannot determine which is the proper standard of care in a motion for summary judgment. Plaintiff presents evidence that the standard of care is the CDC guidelines, the ACOG guidelines, risk factors and a reasonable expectation that the patient may not be tested during the 35-37 week period. (See Cardwell Decl.) Whether these standards are also a physician's standards is not relevant to this motion. Plaintiff presents evidence that the hospital policy did not conform to all of these standards. In particular, considering the evidence in the light most favorable to plaintiff, the evidence shows that the ACOG standards, and other stated risk factors, were not in MCH's Prevention policy and the proximity to the 35-37 week gestation period was not within MCH's policy. A reasonable jury could conclude that the standard of care includes the ACOG factors, risk factors, and the proximity to the 35-37 week gestation.

### 3. Breach of the Duty and Causation

Defendants also present evidence that challenge the violation of the standard of care and causation. MCH seeks to show through the declarations of Drs. Reingold and Nageotte and Nurse Funk that there was no breach of duty because the care and treatment of plaintiff was within the standard of care applicable at the time.

If the circumstances permit a reasonable doubt whether the defendant's conduct violates the standard of due care, the doubt must be resolved by the jury as an issue of fact rather than of law by the court. *Onciano v. Golden Palace Restaurant, Inc.*, 219 Cal.App.3d 385, 394-395, 268 Cal.Rptr. 96 (1990). "In a medical malpractice action the element of causation is satisfied when a plaintiff produces sufficient evidence 'to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result.'" *Espinosa v. Little Co. of Mary Hosp.*, 31 Cal.App.4th 1304, 1314-1315 (1995). Like breach of duty, causation also is ordinarily a question of fact which cannot be resolved by summary judgment. The issue of causation may be decided as a question of law only if, under undisputed facts, there is no room for a reasonable difference of opinion. *Onciano*, 219 Cal.App.3d at 394-395.

The Court does not reach the factual issues of breach of duty and causation. Both breach of the duty of care and causation are factually disputed. If plaintiff's evidence is believed, plaintiff's pregnancy

was high risk, with risk factors that should have been considered but were not. If plaintiff's evidence is believed, and MCH should have tested and treated for GBS, causation may be shown. She was not given IAP for potential GBS infection. It is undisputed that plaintiff's baby died as a result of the GBS infection. (See Cardwell Decl. ¶2, 35, 40.) Accordingly, because the standard of care is a disputed factual issue, the Court does not reach the factual issues of breach of duty and causation.

### 4. Hospital Liability for Acts of Drs. Siddiqi and Dhillon

MCH argues that Dr. Siddiqi and Dr. Dhillon are not and were not employees of MCH. Since they were not employees, MCH cannot be liable in the professional malpractice cause of action for their conduct under the doctrine of *respondeat superior*. MCH argues that physicians were independent contractors and are not agents of the hospital merely because he or she is on the medical staff. MCH also argues that each time plaintiff sought services at MCH, plaintiff signed documents "Conditions of Admissions" and "Authorization and Consent" which gave notice that the physicians were not employees of MCH. (MCH P&A p. 15-16.)

Plaintiff argues that Dr. Siddiqi an Dr. Dhillon were "ostensible" agents of MCH. She argues that MCH gave the impression the doctors were employees because MCH operates as a hospital and provides obstetrics, labor and delivery services. The doctors provided her with the care and gave hospital staff instruction. (Plaintiff P&A P. 19.) Plaintiff argues that signing the "Conditions of Admissions" is not dispositive. She notes that California courts have held that summary judgment is inappropriate because the forms do not "conclusively" establish a plaintiff should have known there was no agency. *See Mejia v. Community Hospital of San Bernardino*, 99 Cal.App.4th 1448, 122 Cal.Rptr.2d 233 (2002).

Under California law, vicarious liability has been extended to a hospital entity under a theory of ostensible agency for the acts of nonemployee physicians who perform services on hospital premises. *See, e.g.*, *Ermoian v. Desert Hospital*, 152 Cal.App.4th 475, 505, 61 Cal.Rptr.3d 754 (2007). A hospital is liable for a physician's malpractice when the physician is actually employed by or is the ostensible agent of the hospital. *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 103, 11 Cal.Rptr.2d 468, 477 (1992); *but see also Mayers v. Litow*, 154 Cal.App.2d 413, 417-418 (1957) (A physician is not an agent of a hospital merely because he or she is on the medical staff of the hospital.) Civil Code §2300

provides, "An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who is not really employed by him." Civil Code §2334 further provides, "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof."

Under California law, hospitals are generally deemed to have held themselves out as the provider of services unless they gave the patient contrary notice, and the patient is generally presumed to have looked to the hospital for care unless he or she was treated by his or her personal physician. *Mejia v. Community Hosp. of San Bernardino*, 99 Cal.App.4th 1448, 122 Cal.Rptr.2d 233 (2002). *Mejia* involved the application of the ostensible agency doctrine to physicians working within hospitals. In *Mejia*, the court explained the elements required for "ostensible agency" are: "(1) conduct by the hospital that would cause a reasonable person to believe that the physician was an agent of the hospital, and (2) reliance on that apparent agency relationship by the plaintiff. *Id.* at p. 1453. The first element is satisfied when a hospital holds itself out as a provider of care, which it is deemed to do unless it gives the patient contrary notice. *Id.* at 1454. The second element of reliance is satisfied when the plaintiff looks to the hospital for services, rather than to the individual physician; moreover, reliance is generally presumed absent evidence that the plaintiff knew or should have known that the physician was not the hospital's agent. *Ibid.* The question of ostensible agency is generally a question for the trier of fact unless the evidence conclusively establishes that the patient knew or should have known that the treating physician was not an agent of the hospital. *Id.* at 1458. Generally, under California law, ostensible authority is for a trier of fact to resolve and the issue should not be decided by an order granting summary judgment. *American Cas. Co. of Reading, Pennsylvania v. Krieger*, 181 F.3d 1113 (9th Cir. 1999).

Here, the Court cannot chose between stronger and weaker evidence in deciding a motion for summary judgment. MCH presents evidence that the issue is foreclosed because of the "Conditions of Admission," which stated that the physicians were not the hospital's agents, but rather independent

contractors.[4]  On the other hand, under California's lenient standard of ostensible authority, plaintiff made a sufficient showing on the question of ostensible agency to avoid summary judgment.  Plaintiff declared that she had no reason to believe that Drs. Siddiqi and Dhillon were not hospital employees, that she believed they were, "and was never told otherwise."  She was shackled, in pain, and "forced" to sign the forms.  In the face of these affirmations, the presence of the Conditions of Admission does not establish "conclusively" that plaintiff should have known there was no agency.  The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson,* 477 U.S. at 255.

**C.    State Law Claim for Wrongful Death**

Plaintiff's sixth cause of action is for wrongful death.  MCH argues that summary judgment is warranted on this claim because MCH met the standard of care in its treatment of plaintiff.

California Code of Civil Procedure § 377.60 establishes a separate statutory cause of action in favor of specified heirs of a person who dies as a result of the 'wrongful act or neglect' of another.  Under a wrongful death cause of action, the specified heirs are entitled to recover damages on their own behalf for the loss they have sustained by reason of the bodily injury victim's death.  *See Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 105, 11 Cal.Rptr.2d 468, 478 (1992).  Although it is a statutorily-created action, a wrongful death suit predicated on negligence must still contain the elements of actionable negligence.  *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th at 105.  The state law claim for negligence requires proof of (1) the duty, (2) breach, (3) causal connection, and (4) actual loss. *Id., accord Mattco Forge, Inc. v. Arthur Young & Co.,* 52 Cal.App.4th 820, 833 (1997).

In diagnosing and treating patients, doctors must exercise the reasonable degree of skill, knowledge and care ordinarily exercised by doctors under similar circumstances in their professional community. The standard of skill, knowledge and care prevailing in a medical community is ordinarily

---

[4] In its reply brief, MCH argues that the evidence plaintiff presents is suspect.  MCH points out that at plaintiff's deposition, after she answered that she had no reason to believe that the physicians were employees of MCH, a short recess was taken.  After the recess, plaintiff clarified her previous testimony, stating that she was incorrect when she said that she had no reason to believe Drs. Siddiqi and Dhillon were employees of MCH.  She testified that the physicians had on name tags, gave instructions to personnel, among other things. (MCH Reply p. 14-15; Van Horn Depo, p. 262-264 (Exh. F to Wainwright Decl.)  This court cannot choose between believable evidence and purported evidence not worthy of credence.

a matter within an expert's knowledge. Expert opinion, therefore, is required to determine the probability of negligence where a medical process is not a matter of common knowledge. *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th at 106. Expert testimony is required to decide the issues raised in the complaint regarding the applicable standard of care. *Osborn v. Irwin Memorial Blood Bank*, 5 Cal.App.4th 234, 273 (1992).

Since issues of fact exist as to the standard of care, the cause of action for wrongful death cannot be summarily adjudicated.

**D.    Deliberate Indifference Standard**

The Seventh Cause of Action is for Deliberate Indifference pursuant to 42 U.S.C. §1983. MCH argues that summary judgment should be granted as to this claim because: (1) plaintiff cannot show "deliberate indifference" because she cannot show a lesser standard of negligence, (2) MCH was not responsible for prenatal care including testing for GBS in August 2007, (3) plaintiff cannot show deliberate indifference merely because Drs. Siddiqi and Dhillon were granted hospital privileges, and (4) she cannot show deliberate indifference with respect to MCH's GBS Prevention Policy and the enforcement of the policy. MCH argues it was not responsible for prenatal care and all of plaintiff's visits to MCH, except for delivery, were for acute care.

Plaintiff argues that there is a material issue of fact that MCH exhibited deliberate indifference through its GBS Policy. (Plaintiff's Opposition p. 24-25.) Plaintiff argues that MCH interprets its policy to "not provide" for testing prisoners for GBS. Plaintiff further argues that MCH's Prevention Policy regarding GBS is deliberate indifference because it fails to address all of the risk factors, and fails to administer IAP for "unknown" GBS despite IAP being "simple, safe, inexpensive treatment." *Id.*

**1.    Two Prong Test - the Objective Prong**

Denial of medical attention to prisoners constitutes an Eighth Amendment violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976). Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety." *Id.*

The "deliberate indifference" standard involves an objective and a subjective prong. First, the

alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1991) (Such a claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need"), *overruled on other grounds*, *WMX Tech. v. Miller*, 104 F.3d 1133 (9th Cir. 1997). By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation. *Farmer v. Brennan*, 511 U.S. at 834.

The parties do not address the objective prong of the deliberate analysis and thereby the Court assumes a serious medical need existed.

## 2. Subjective Prong of Deliberate Indifference

The second prong involves the subjective component. If a prisoner establishes the existence of a serious medical need, he or she must then show that prison officials responded to the serious medical need with deliberate indifference. *Farmer*, 511 U.S. at 834. In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care. *Hutchinson v. United States*, 838 F.2d 390, 393-94 (9th Cir.1988). The prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 837. A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." *Id*.; *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk."), *cert. denied*, 537 U.S. 1106 (2003).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). "[T]he deliberate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant to be *subjectively* aware that *serious* harm is likely to result from a failure to provide medical care." *Gibson*, 290 F.3d at 1193 (Emphasis in original). Before it can be said

17

that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (*citing Estelle*, 429 U.S. at 105-06).

### 3. Plaintiff Fails to Raise a Question of Fact Regarding Deliberate Indifference

Plaintiff acknowledges the medical standard of care as stated in the Fourth Amended Complaint. "The CDC and ACOG guidelines on GBS represent the accepted standard of care for all pregnant women. They have been in place since 2002 and are widely known and followed." (Doc. 167, FAC ¶23.) Plaintiff's expert, Michael Cardwell, M.D., acknowledges that national guidelines for GBS testing were created by the CDC and that the guidelines are the minium standard of care for GBS testing and treatment. (Cardwell Decl. ¶11 ("Every healthcare provider must be aware of this standard and every hospital should have a policy in place concerning GBS screening").) He acknowledges that the guidelines recommend universal prenatal screening and identify various risk factors. (Cardwell Decl. ¶12.) Dr. Cardwell does not dispute that MCH had in place a policy which complied with the minimum requirements of CDC. He disputes the <u>circumstances</u> in which the policy should be applied - all prenatal care v. admission for labor and delivery and whether the policy should have said more. (Cardwell Decl.¶30-31.) Dr. Cardwell states that MCH should have tested plaintiff for GBS, both when she visited MCH as part of her acute care visits and/or at the time of her admission for delivery, because she was approaching or near the CDC guidelines period of 35-37 gestation. In addition to failing to test plaintiff, Dr. Cardwell challenges MCH's conduct for failure to obtain plaintiff's medical records to learn of prior testing (Cardwell Decl. ¶ 22-28) and failure to assess the additional risk factors identified by ACOG. (Cardwell Decl. ¶34.) In general, Dr. Cardwell faults MCH for failure to test plaintiff for GBS because of her "unknown" GBS status and combination of ACOG risk factors.

Here, plaintiff and MCH differ on the proper course of testing for GBS. A difference in opinion between plaintiff and MCH about the preferred course of medical treatment does not constitute an Eighth Amendment violation. "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to [the prisoner's]

18

health.'" *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). In *Toguchi*, plaintiff's physician expert opined that the treating physician administered medications without assessing prisoner's actual medical condition and without regard to possible withdrawal systems. The Court in *Toguchi* stated that the expert's opinion was one of negligence as opposed to deliberate indifference: "a difference of opinion about course of medical treatment necessary to treat state prisoner's diabetes did not amount to deliberate indifference to serious medical needs of prisoner." The Court stated that medical malpractice – negligence in diagnosing or treating a condition, or an inadvertent failure to provide adequate medical care – does not rise to the Eighth Amendment level. *Id.* at 1057.

Here, MCH assessed the particular risk to plaintiff of GBS. MCH chose a course of nontreatment because plaintiff did not exhibit certain risk factors. It is undisputed that at each of plaintiff's pre-admission visits to MCH, she was monitored according to the risk factors in the MCH Prevention policy and CDC guidelines - her gestation period was noted, her temperature was below the caution level, her membranes where intact and not ruptured. (Plaintiff's Response to MCH's Fact Statement, Fact 6 (August 4 visit); Fact 16 (August 20 Visit); Fact 18 ("did not meet the criteria for being tested"); Fact 21 (August 21 visits).) At each visit, she did not exhibit risk factors. This undisputed evidence establishes that on each of plaintiff's acute care visits, MCH assessed plaintiff for the risk factors associated the MCH Prevention policy and CDC guidelines. (See Cardwell Decl. ¶12 (identifying the CDC risk factors).) MCH then chose not to test her and treat her for GBS because she did not meet any of the risk factors stated in the MCH Prevention policy and the CDC guidelines. Thus, MCH did not "disregard the risk the harm" because it actually assessed the particular risk of harm.

Further, upon plaintiff's admission into MCH on August 26, 2007, plaintiff was examined by hospital staff and monitored according to MCH's Prevention policy and CDC guidelines. No argument is made that MCH failed to monitor plaintiff according to MCH's Prevention policy and CDC guidelines. Thus, MCH did not "disregard the risk the harm." While plaintiff's expert states that "MCH's policy was inadequate as it failed to address the additional risk factors identified by ACOG," he does not state that the monitoring of plaintiff during visits was unacceptable medical practice. Accordingly, the evidence does not raise an issue of fact that the course of treatment was medically unacceptable and chosen in conscious disregard of the risk of harm to plaintiff.

Plaintiff's expert states that other actions should have taken place. Plaintiff's expert states that once the treating physician is aware of a patient's unknown GBS status, the physician must, in accordance with the standard of care, order a GBS test, at any point approaching, during and after the GBS testing window (35-37 weeks of gestation), regardless of whether a patient has already been admitted for labor and delivery. (Cardwell Decl. ¶36.)

Failing to order a GBS test, however, is falling below the standard of care, but it is not deliberate indifference. The undisputed facts are that MCH was cognizant of the GBS risk and monitored plaintiff for any signs according to its Prevention policy and the CDC guidelines. MCH took active steps to guard against GBS infection by monitoring plaintiff. What plaintiff argues is that MCH should have taken a <u>different</u> course of treatment because plaintiff believes it is the <u>better</u> practice to test and treat for GBS when the condition is "unknown" in light of additional risk factors. (See generally Cardwell Decl. ¶¶29-40.) A difference of opinion between medical personnel regarding treatment does not amount to deliberate indifference. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

MCH was consistently responsive to plaintiff's GBS medical needs during her several pre-labor visits to MCH. It was also responsive to her GBS medical needs during the labor and delivery. It is undisputed that MCH monitored plaintiff for the risk factors identified in the MCH Prevention policy and the CDC guidelines. (See Cardwell Decl. ¶11.) Whether MCH's responses were medically reasonable, given her medical condition and the risks associated with her pregnancy, is not a question of violation under the Eighth Amendment for deliberate indifference to medical needs.

Plaintiff argues that the "policy itself" is unconstitutional because it does not provide for testing and also because MCH interprets the written policy as to "not provide" testing for GBS. Plaintiff argues that "a policy of not testing" is deliberate indifference because of the presence of additional risk factors and in light of the low cost of treatment. The standard for this Court, however, is that an official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety. . ." *Farmer*, 511 U.S. at 834, 837, 114 S.Ct. 1970. There is no evidence that MCH disregarded the risk to plaintiff's health from GBS. MCH had a policy in place with corresponded to the CDC guidelines, which plaintiff acknowledges is, at least, the minimum standard of care. Rather, plaintiff's position is that MCH could have and should have <u>done more</u>.

1    Again, to establish an official's deliberate indifference in violation of the Eighth Amendment,

2   plaintiffs must show that the official "knows of and disregards an excessive risk to inmate health or

3   safety." Merely presenting evidence that the hospital was poorly managed at the time of the incident,

4   failing to request records and losing records, and failing to follow the standard of care is insufficient to

5   establish a deliberate violation of plaintiff's constitutional rights. To raise a triable issue of fact under

6   the Eighth Amendment, plaintiff, must show that defendants knew of and disregarded an excessive risk

7   to inmate safety. *Farmer,* 511 U.S. at 837. Plaintiff has not made such a showing because the

8   undisputed evidence shows MCH took active steps to guard against the particular risk. Summary

9   judgment on this claim for MCH is appropriate.

10                                                  **CONCLUSION**

11          For the foregoing reasons, the Court Orders as follows on Defendant Madera Community

12   Hospital's motion for summary judgment, or in the alternative, summary adjudication:

13          1.      DENIES the motion as to the Fourth Cause of Action for Professional Negligence,

14          2.      DENIES the motion as to the Sixth Cause of Action for Wrongful Death,

15          3.      GRANTS the motion as to the Seventh Cause of Action for Deliberate Indifference

16                  pursuant to 42 U.S.C. §1983.

17          IT IS SO ORDERED.

18   **Dated:      February 17, 2010                      /s/ Lawrence J. O'Neill**
                                                          UNITED STATES DISTRICT JUDGE

21