1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    DONDI VAN HORN,                              CASE NO. CV F 08-1622 LJO DLB

12                    Plaintiff,               **ORDER ON DEFENDANTS TILTON,**
                                               **DEZEMBER, HORNBEAK, MARTIN, VIRK**
13                                             **AND HEINRICH MOTION FOR SUMMARY**
             vs.                               **JUDGMENT** (Doc. 275)
14
      TINA HORNBEAK, et al,
15
                    Defendants.
16    _____/

17

18            By notice filed on February 26, 2010, Defendants Tilton, Dezember, Hornbeak, Martin, Virk and

19    Heinrich seek summary judgment or in the alternative summary adjudication pursuant to Fed.R.Civ.P.

20    56 on the First and Second Causes of Action for Deliberate Indifference to Medical Needs pursuant to

21    42 U.S.C. §1983.  Plaintiff Dondi Van Horn ("plaintiff") filed an opposition on March 16, 2010.

22    Defendants filed a reply on March 23, 2010.  Pursuant to Local Rule 230(g), this matter was submitted

23    on the pleadings without oral argument.  Therefore, the hearing set for March 30, 2010 was VACATED.

24    Having considered the moving, opposition, and reply papers, as well as the Court's file, the Court issues

25    the following order.

26                                      **BACKGROUND**

27    **A.      Overview of Plaintiff's Medical Condition**

28            On July 31, 2007, Van Horn entered Valley State Prison for Women ("VSPW") inmate when

                                              1

1  she was 34 weeks pregnant.  Plaintiff alleges that during her incarceration and pregnancy, the national

2  standard of care provided that pregnant women should be tested between the 35th and 37th weeks of

3  pregnancy for Group B Streptococcus, a bacterium ("GBS").  (Fourth Amended Complaint "FAC" ¶¶18-

4  21.)   Before delivery and while incarcerated, plaintiff visited the doctors at VSPW and Madera

5  Community Hospital ("MCH"), but was never tested for GBS.  (FAC ¶ 22-40.)  On August 26, 2007,

6  at full term pregnancy, Van Horn delivered her son by cesarean section.  Her son's condition deteriorated

7  rapidly, and he died in the late evening of August 27, 2007.

8  **B.      Overview of the Defendants in this Motion**

9          The moving defendants are various representatives who administer California Department of

10  Corrections and Rehabilitation.  An overview of their roles is as follows:

11          **James E. Tilton:**   Tilton was the California Department of Corrections and Rehabilitation

12  ("CDCR") Acting Secretary from April 16 to September 12, 2006, and served as Secretary from

13  September 13, 2006 to May 16, 2008. As Acting Secretary and Secretary, Tilton was responsible for the

14  overall operation and direction of the state's juvenile and adult correctional systems for incarcerated

15  prisoners and parolees. (Doc. 275, Statement of Facts, fact 12.)

16          **Robin Dezember:** Dezember was the Chief Deputy Secretary of the Division of Correctional

17  Health Services for CDCR from June 4, 2007 to December 30, 2008. Dezember was responsible for

18  managing and overseeing the mental and dental health services provided to inmates in the custody of

19  CDCR.  (Doc. 275, Statement of Facts, fact 18.)

20          **Dr. Daun Martin:** Martin was the Acting Health Care Manager (AHCM) at VSPW from

21  January 2005 to March 2008 who was responsible for the supervision, management, and control of the

22  health care services department at the prison, and her duties included policy development, medical

23  record maintenance, and staffing issues. (Doc. 275, Statement of Facts, fact 62.)

24          **Tina Hornbeak**: Hornbeak was the Acting Warden at VSPW from July 2006 to October 31,

25  2007 who was responsible for the overall operations at VSPW.  (Doc. 275, Statement of Facts, fact 68.)

26          **Dr. Virk:** Virk was the Chief Physician and Surgeon at VSPW who was responsible for

27  supervising the other physicians and nurse practitioners at the prison. Virk was Heinrich's direct

28  supervisor.  (Doc. 275, Statement of Facts, fact 76.)

1      **Dr. James Heinrich:** Heinrich was the OB/GYN doctor at VSPW who was responsible for

2  plaintiff's prenatal care while at VSPW.  (Doc. 275, Statement of Facts, fact 3, 32.)

3  **C.     CDCR's and VSPW's Policies and Procedures for Pregnant Inmates**

4      Defendants present evidence that since 2003, CDCR has had policies and procedures for

5  providing medical treatment to pregnant inmates.  These policies are outlined in the Inmate Medical

6  Services Policies and Procedures Manual, Volume 4, Chapter 24, entitled "Pregnant Inmate Care and

7  Birth of Children."  Chapter 24 provides that once it is determined an inmate is pregnant, she will

8  receive a health screening, and will receive certain care:  (1) HIV, abortion, and pregnancy counseling

9  and information; (2) prenatal vitamins, iron, and folic acid; (3) chronos for extra milk, snacks, and

10  additional nutrients or meals, as necessary; (4) chronos for lower bunk accommodations and any other

11  medical clearances or restrictions, as needed; (5) priority referral to a dentist; (6) counseling with a

12  Social Worker for the placement and care of the child after delivery; and (7) regularly scheduled OB

13  visits every four weeks during the first trimester, every three weeks up to the thirtieth week of gestation,

14  every two weeks up to the thirty-sixth week of pregnancy, and weekly after the thirty-sixth week until

15  delivery. (Doc. 280, (Virk Decl. Ex. B, pg. 4-24-1 to 4-24-2.))

16      VSPW adopted similar policies and procedures.  In Operational Procedure No. 83080.04,

17  "Pregnant Inmate Care and Birth of Children," VSPW adopted a policy which mirrors the policies and

18  procedures for providing prenatal care and treatment to pregnant inmates outlined in CDCR's Chapter

19  24.  (Doc. 280, Statement of Facts, fact 27; Virk Decl. ¶9.)

20      In July and August 2007, VSPW's policy for conducting Group B Streptococcal (GBS) testing

21  on pregnant inmates was to follow the community standard of care.  GBS was treated like any other

22  medical condition, and the OB/GYN was expected to follow the community standard.  (Doc. 280, Virk

23  Decl.¶10; Doc. 275, Statement of Facts, fact 25; Doc. 301, Plaintiff's Response Facts, fact 30.) VSPW's

24  policy for GBS screening was also to follow the community standard and the Center for Disease Control

25  guidelines to test patients between thirty-five and thirty-seven weeks by culture of the

26  perirectal/perivaginal area for GBS.  (Doc. 281, Exh. F, Heinrich Depo. 63:10-16; doc. 280 Virk Decl.

27  ¶10.)  The specific policy for GBS testing is not a written policy, but the policy is to follow the

28

community standards of lab testing and prenatal care.[1]  (Doc. 281, Exh. F, Heinrich Depo. 63:17-25; Doc. 301, Plaintiff's Response Facts, fact 30-31.)  It is undisputed that whatever policy existed for GBS testing, it was not a written policy.

**D.     VSPW's OB/GYN Clinic**

        CDCR defendants present evidence that Dr. Heinrich began working at VSPW in December 2005 and was the only OB/GYN doctor at VSPW.  The clinic at VSPW consisted of Heinrich, two registered nurses, a part-time nurse practitioner and two license vocation nurses.  A registered nurse, was employed as the OB Coordinator at VSPW, and she or the doctor was responsible for completing the Hollister (prenatal) forms, starting an inmate's chart, conducting the initial screening history and exam, and scheduling appointments for pregnant inmates with Heinrich. (Doc. 301, Plaintiff's Response Facts, fact 34.)  To ensure that pregnant inmates underwent the necessary prenatal tests Heinrich reminded his staff that he and the nurses had to check the individual patient files to ascertain what tests needed to be done.  (Doc. 301, Plaintiff's Response Facts, fact 37.)  A nurse also developed a form listing all the prenatal tests, and this form was placed in the patient's chart to help the clinic staff remember what prenatal tests needed to be done. (Doc. 301, Statement Facts, fact 38, Hansen Dep. 89:1-18, 91:17-92:2; 141:7-14.)  Plaintiff's medical file contained the prenatal-test form.  (Hansen Dep. 91:17-92:2; Doc. 301, Plaintiff's Response Facts, fact 40.)

**E.     Plaintiff's Medical Care at VSPW**

        When plaintiff arrived at VSPW on July 31, 2007, she was 34 weeks pregnant.  Her physician at VSPW was Dr. Heinrich.  Defendants present evidence that plaintiff was tested and treated at the VSPW OB/GYN clinic on multiple occasions before the birth.  On the day Plaintiff arrived at VSPW, she was seen by a nurse in the Reception Center, who ordered various tests for Plaintiff and prescribed some medication. (Doc. 301, Plaintiff's Response Facts, fact 43; Esquivel Decl. Ex. D, 1.)[2]  Plaintiff had an initial prenatal screening with Nurse Hansen on August 1, 2007, where Hansen took Plaintiff's

---

[1] The disputes as to this policy are discussed at length, *infra*.

[2] The medical evidence is largely undisputed.  Plaintiff does not dispute that the evidence shows she was seen on a certain date and the certain treatment was rendered, as discussed in this section.  Plaintiff, however, disputes any defense implication that GBS testing, or normal prenatal care, was ordered at VSPW.  The Court acknowledges that no party contends GBS testing was ever ordered at VSPW.

4

medical history and vital signs. (Doc. 301, Plaintiff's Response Facts, fact 43; Hansen Dep. 49:4-9, 127:22-144:1; Esquivel Decl. Ex. D, 2-5.) Dr. Heinrich also saw plaintiff on August 1, because plaintiff complained of an abscess on her arm.  Dr. Heinrich performed an ultrasound, conducted a pap smear, and prescribed her various medications. (Doc. 301, Plaintiff's Response Facts, fact 46; Heinrich Dep. 124:7-12; Hansen Dep. 132:1-10, 144:7-18.)

Plaintiff was seen at the clinic on August 9, 2007 where she complained of exposure to chicken pox.  Dr. Heinrich ordered blood tests, which were performed.  (Doc. 301, Plaintiff's Response Facts, fact 48, Hansen Dep. 124:16-125.)  On August 10, 2007, Heinrich saw Plaintiff during an unscheduled visit to follow-up with Plaintiff and determined if her symptoms from August 4, which caused her to be sent to the hospital, resolved. He prescribed her pain medication. (Doc. 301, Plaintiff's Response Facts, fact  49, Heinrich Dep. 131:1-133:20.)  She was treated for cramping and pressure and given pain medication on August 12, 2007.  (Doc. 301, Plaintiff's Response Facts, fact 50.)  With similar complaints on August 17, 2007, Dr. Heinrich checked her cervix, vital signs, took the baby's measurements, tested her urine, and prescribed her pain medication to alleviate her pain.  (Doc. 301, Plaintiff's Response Facts, fact  51, Heinrich Dep. 133:25-136:18.)  On August 20, 2007, Dr. Heinrich examined plaintiff, checked her cervix, and monitored the baby's movement, and because she was having contractions, sent her to Madera Community Hospital.  (Doc. 301, Plaintiff's Response Facts, fact 52, Heinrich Dep. 136:19-137:20.)

On August 21, 2007, Plaintiff again presented in the Triage and Treatment Area ("TTA") with contractions, and she was referred to Heinrich for further examination. He put her on a fetal heart monitor, checked her cervix, and saw that she was dilated and eighty percent effaced; he ordered her to Madera Community Hospital.  (Doc. 301, Plaintiff's Response Facts, fact  53, Heinrich Dep. 138:4-141:6.)  When she returned, Dr. Heinrich admitted her into the infirmary at VSPW for overnight observation.  She was discharged to her cell the next day and prescribed pain and other medications. (Doc. 301, Plaintiff's Response Facts, fact  55.) She was seen at the clinic on August 23 and 24 for cramping, nausea, and vomiting, and Dr. Heinrich monitored the fetus, prescribed pain medication, among other things.  (Doc. 301, Plaintiff's Response Facts, fact  56-57.)  She was sent to Madera Community Hospital on August 26, 2007 for delivery of her baby.

**F.    Challenged Causes of Action**

The defendants challenge the following causes of action in this motion:

-    First Cause of Action for Deliberate Indifference pursuant to 42 U.S.C. §1983 against Tilton and Dezember.

-    Second Cause of Action for Deliberate Indifference pursuant to 42 U.S.C. §1983 against Hornbeak, Dr. Daun Martin, Dr. Pal Virk, and Dr. James Heinrich.

The first cause of action alleges deliberate indifference by having incompetent and inadequate medical staffing, inaccurate and substandard medical record-keeping, and failure to provide standardized prenatal care and monitoring. (FAC ¶61.) The second cause of action alleges deliberate indifference by failing to provide necessary prenatal care during pregnancy, failing to maintain accessible and accurate medical records of Plaintiff, refusing to follow medical recommendations for Plaintiff's continued care, and failing to administer routine vaginal GBS screening and to treat Plaintiff during her term. (FAC ¶67.)

## ANALYSIS AND DISCUSSION

**A.    Summary Judgment/Adjudication Standards**

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law. F.R.Civ.P. 56( c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56 ( c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and

1   all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of

2   the opposing party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986);

3   *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient

4   disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as

5   a matter of law."  *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

6       To carry its burden of production on summary judgment/adjudication, a moving party "must

7   either produce evidence negating an essential element of the nonmoving party's claim or defense or

8   show that the nonmoving party does not have enough evidence of an essential element to carry its

9   ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210

10   F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d

11   563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party

12   must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102;

13   *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts

14   are material.  Only disputes over facts that might affect the outcome of the suit under the governing law

15   will properly preclude the entry of summary judgment."  *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

16       "If a moving party fails to carry its initial burden of production, the nonmoving party has no

17   obligation to produce anything, even if the nonmoving party would have the ultimate burden of

18   persuasion at trial."  *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

19   "If, however, a moving party carries its burden of production, the nonmoving party must produce

20   evidence to support its claim or defense."  *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

21   at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

22   fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see*

23   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56( c) mandates the entry of

24   summary judgment, after adequate time for discovery and upon motion, against a party who fails to make

25   the showing sufficient to establish the existence of an element essential to that party's case, and on

26   which that party will bear the burden of proof at trial.")

27       "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

28   the nonmoving party defeats the motion."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

**B.     Deliberate Indifference Standard**

The First and Second Causes of Action are for Deliberate Indifference pursuant to 42 U.S.C. §1983.  Defendants argue that summary judgment should be granted as to these claims because plaintiff cannot show "deliberate indifference:"

(1) Tilton, Dezember, and Hornbeak did not have the power to adopt or implement any policy or procedure concerning the medical care of prisoners, hire or fire medical staff, or supervise the medical records department at VSPW;

(2) in 2007, CDCR and VSPW had policies and procedures concerning the prenatal treatment of inmates, including GBS screening, that met the standard of care;

(3) Martin and Virk properly and adequately supervised their subordinates and had no knowledge that Plaintiff was purportedly receiving inadequate prenatal care;

(4) Heinrich rendered appropriate medical care on all those occasions that he treated her and did not ignore her complaints; and

(5) Defendants are entitled to qualified immunity because they did not violate Plaintiff's constitutional rights and acted reasonably under the circumstances.

**1.     Two Prong Test - the Objective Prong**

Denial of medical attention to prisoners constitutes an Eighth Amendment violation if the denial amounts to deliberate indifference to serious medical needs of the prisoners. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976).  Under the Eighth Amendment's standard of deliberate indifference, a person is liable for denying a prisoner needed medical care only if the person "knows of and disregards an excessive risk to inmate health and safety." *Id.*

The "deliberate indifference" standard involves an objective and a subjective prong.  First, the alleged deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan*, 511 U.S.

825, 834 (1994).  A medical need is serious "if the failure to treat the prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir.1991) (Such a claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need"), *overruled on other grounds*, *WMX Tech. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).  By establishing the existence of a serious medical need, a prisoner satisfies the objective requirement for proving an Eighth Amendment violation.  *Farmer v. Brennan*, 511 U.S. at 834.

Defendants do not dispute, for purposes of this motion, that Plaintiff's GBS status was a "serious" medical condition.  (Doc. 274, P&A p.10, n.10.)

### 2.      Subjective Prong of Deliberate Indifference

The second prong involves the subjective component.  If a prisoner establishes the existence of a serious medical need, he or she must then show that prison officials responded to the serious medical need with deliberate indifference.  *Farmer*, 511 U.S. at 834.  In general, deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown by the way in which prison officials provide medical care.  *Hutchinson v. United States*, 838 F.2d 390, 393-94 (9th Cir.1988).  The prison official must act with a "sufficiently culpable state of mind," which entails more than mere negligence, but less than conduct undertaken for the very purpose of causing harm.  *Farmer,* 511 U.S. at 837; *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991) (indicating that there is no significant distinction between wantonness and deliberate indifference).  A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety."  *Farmer,* 511 U.S. at 837; *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1187 (9th Cir. 2002) ("If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk."), *cert. denied*, 537 U.S. 1106 (2003).

"Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  "[T]he deliberate indifference doctrine contains a heightened foreseeability requirement, this requirement differs from the traditional negligence foreseeability requirement only insofar as deliberate indifference requires the defendant to be *subjectively* aware that *serious* harm is likely to result from a

failure to provide medical care." *Gibson*, 290 F.3d at 1193 (Emphasis in original). Before it can be said that a prisoner's civil rights have been abridged with regard to medical care, however, "the indifference to his medical needs must be substantial.  Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Laboratories*, 622 F.2d 458, 460 (9th Cir.1980) (*citing Estelle*, 429 U.S. at 105-06).

## C.      Authority of Tilton, Dezember and Hornbeak

        Plaintiff alleges that defendant Tilton, Dezember, and Hornbeak were deliberately indifferent because they "adopted and effected" policies and customs that resulted in inadequate prenatal care, incompetent and inadequate medical staffing, and inaccurate and substandard medical record keeping." (FAC ¶¶61, 67.)

        These defendants argue they did not have the authority to implement or adopt any policy or procedure concerning the medical treatment of inmates.  They argue that in February 2006, a federal receiver was appointed to take over supervision, management and control of the medical health care services for inmates.  They did not have authority to make policy or procedure because the receiver had taken control of the prison health care system by the time plaintiff was injured in August 2007.  (Doc. 27, Moving P&A p.12.)

### 1.      Appointment of the Receiver

        In *Plata v. Schwarzenegger*, N.D. Cal. Case No. CV 01-1351 ("*Plata*"), Judge Henderson, U.S. District Judge for the Northern District of California, established a receivership to manage provision of medical care to California inmates.  In his opinion authorizing appointment of a receiver, Judge Henderson determined that the California prison medical care system was "broken beyond repair." *Plata v. Schwarzenegger*, No. 01-1351, 2005 WL 2932253 (N.D.Cal. Oct.3, 2005).  In his February 14, 2006 order appointing a receiver ("OAR order"), Judge Henderson appointed the Receiver to "take control of the delivery of medical services" to California state prisoner.  The OAR ordered the receiver to "provide leadership and executive management of the California prison medical health care delivery system with the goals of restructuring day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care" to inmates. (Doc. 44, Exh. 1.)  The OAR empowered the Receiver "to control, oversee, supervise, and direct all

administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of CDC." The OAR granted the Receiver "power to hire, fire, suspend, promote, transfer, discipline, and take all other personnel actions regarding CDC employees or contract employees who perform services related to the delivery of medical care" to inmates. The OAR further granted the Receiver the Secretary's powers and suspended the Secretary's powers for providing medical care:

> "The Receiver shall exercise all powers vested by law in the Secretary of the CDCR as they relate to the administration, control, management, operation, and financing of the California prison medical health care system. The Secretary's exercise of the above powers is suspended for the duration of the Receivership; it is expected, however, that the Secretary shall work closely with the Receiver to facilitate the accomplishment of his duties under this Order." (Doc. 44, Exh.1 p.4.)

The OAR thus "suspended" for the receivership's duration, the CDCR Secretary's "exercise of the above powers."[3] The OAR thus vested in the Receiver the duties to advance the provision of medical care of prisoners to constitutional levels.

## 2.    Plaintiff's Arguments Regarding the Receiver

Plaintiff argues that this Court has already determined that the Receiver did not displace Tilton's, Dezember's and Hornbeak's authority to establish medical policy. Plaintiff argues that in this Court's February 19, 2009 order on defendants' motion to dismiss, the Court stated:

> "The *Plata* order appointed the receiver to 'provide leadership and executive management,' including "administration, control, management, operation, and financing of the California prison health care system.' Taken to its extreme, the CDC defendants' argument would leave the CDC defendants with nothing to do. As the *Estevez* court observed, the *Plata* order does not relieve the state, and in turn the CDC defendants, of constitutional responsibility for determination of adequate inmate medical care." (Doc. 66, Order on Motion to Dismiss, p. 8.)

Plaintiff cites to *In re Estevez,* 83 Cal.Rptr.3d 479 and *Dunn v. Cate*, 2010 WL 148197 (E.D. Cal. 2008) (Wake, Neil) for the proposition that the Receiver does not displace such defendants' constitutional

---

[3] The Secretary serves as the chief executive officer of the department. Cal.Gov.Code §12838.7 (The Secretary of the Department of Corrections and Rehabilitation shall serve as the Chief Executive Officer of the Department of Corrections and Rehabilitation); §12838 ("There is hereby created in state government the Department of Corrections and Rehabilitation, to be headed by a secretary, who shall be appointed by the Governor, subject to Senate confirmation, and shall serve at the pleasure of the Governor.") The Chief Deputy Secretary is appointed by the governor (Cal.Gov.Code §12838(c)) and is responsible for overseeing various health services, among other things. (Doc. 277, Dezember Decl. ¶2.)

1    duties to provide medical care.

2         *In re Estevez*, a prisoner sought habeas corpus for medical care.  The California Appellate Court

3    struggled with the breadth of the appointment of the receiver, in light of *Plata*.  The defendant warden

4    argued that the executive management of the prison health care system has been transferred from CDCR

5    to the Receiver and the receiver was the proper party for challenges to prison medical care.   83

6    Cal.Rptr.3d at 487.  The receiver took the position that CDCR continues to employ clinical and

7    administrative staff necessary for the delivery of medical care to inmates at the local prison level and

8    that, while such staff ultimately answers to the Receiver and his managerial team, the day-to-day delivery

9    of medical care remains with CDCR employees at the state prisons.  83 Cal.Rptr.3d at 487.

10        The court acknowledged that the appointment of the receiver transferred certain powers to the

11   receiver.  "To the extent that the warden does not have control over an inmate's medical care due to

12   specific restraints imposed by statute or court order, the warden may defer to such party as is legally

13   mandated to provide the requisite care-at this juncture, the Receiver." *Estevez*, 83 Cal.Rptr at 493 (the

14   warden "is powerless to make any decision relative to such care or to direct the Receiver to provide

15   care").   The Court held that the appointment of receiver did not relieve the state of all of its

16   constitutional responsibility to determine whether adequate care was in fact being provided, or whether

17   the proposed medical care or actions to facilitate that care were consistent with the state's overall

18   constitutional responsibility for public safety and welfare.

19        In *Dunn v. Cate*, a prisoner sued under Section 1983 challenging the lack of adequate medical

20   care.  Defendants brought a motion to dismiss under Rule 12(b) contending, as they do defendants here,

21   they lack authority and control over medical care due to the appointment of the receiver.  Relying upon

22   *In re Estevez,* the court held "the Secretary of the CDCR and his or her subordinates are proper parties

23   in an action by an inmate alleging lack of adequate medical care."[4]

24        **3.      Secretary Tilton and Chief Deputy Secretary Dezember Lacked Authority**

25        Secretary Tilton presents undisputed evidence that after the receiver was appointed, he "did not

26   have the authority to implement or adopt any policy or procedure concerning the medical treatment of

27   _____

28        [4] The opinion is unclear as to who were the named defendants.  From the holding, the Secretary of the CDCR and
     some subordinates were named, at a minimum.

1  inmates." (Doc. 276, Tilton Decl. ¶3.)  He states that he did not have authority to "supervise, hire, or

2  terminate medical staff." (Doc. 276, Tilton Decl. ¶3.) He states that "creating policies and procedures"

3  were within the "purview of the federal receiver."  (Doc. 276, Tilton Decl. ¶4.) He states that he

4  "'transitioned' the supervision, control and management of the prison medical-health-care system to the

5  federal receiver" and did not "implement or adopt any policy or procedure concerning the medical care

6  of prisoners." (Doc. 276, Tilton Decl. ¶5.)  Similarly, Chief Deputy Secretary Dezember presents

7  undisputed evidence that after the receiver was appointed, he "did not have the authority to implement

8  or adopt any policy or procedure concerning the medical treatment of inmates." (Doc. 277, Dezember

9  Decl. ¶5.) He states that the "receiver directed and managed all inmate medical-health-care services."

10  (Doc. 277, Dezember Decl. ¶4.)

11       The Court agrees under the facts of this case that these defendants lacked authority.  The

12  Secretary and Chief Deputy Secretary of the CDCR did not have authority to adopt or implement the

13  policies challenged in this litigation.  The appointment of the receiver vested all authority for the

14  provision of medical care in the receiver.  The OAR gave the receiver all of the Secretary's powers for

15  the "the administration, control, management, operation, and financing of the California prison medical

16  health care system." The OAR specifically suspended the Secretary's authority, to exercise those powers.

17  " (Doc. 44, OAR, p.4) ("The Secretary's exercise of the above powers is suspended for the duration of

18  the Receivership . . .")  The OAR suspended the authority of the Secretary for "the administration,

19  control, management, operation, and financing of the California prison medical health care system."

20       Here, at issue is the personal liability of the Secretary for conduct which indisputably falls within

21  the role of the receiver.  Plaintiff alleges:

22           24. Traditionally, the responsibility for administering, managing and
             supervising the health care delivery system at VSPW rests with the
23           Receiver Defendants, the CDCR Defendants and the VSPW Defendants.
             This includes establishing and administering policies for the care and
24           treatment of the medical needs of all inmates within the California
             Department of Corrections system that are in accordance with the
25           accepted standards of care. (Doc. 167, FAC ¶24.)

26           61. At all relevant times, [Secretary Tilton and Chief Deputy Secretary
             Robin Dezember] adopted and effected a policy and custom of deliberate
27           indifference to the serious medical needs of the prisoners at VSPW,
             including Plaintiff, which was manifested in incompetent and inadequate
28           medical staffing, inaccurate and substandard medical record-keeping, and

1       failure to provide adequate, standardized prenatal care and monitoring,
2       including routine screening for vaginal GBS infection.

3   Plaintiff argues that Tilton bore constitutional responsibility for maintaining adequate policies

4 for CDCR prisoners, yet he pursued "doing nothing." (Doc. 300, Plaintiff's Opposition p.12.)   She

5 argues "[t]here is a genuine issue of material fact as to whether Tilton was responsible for failing to

6 implement the policies and procedures at VSPW that caused Ms. Van Horn's injuries." (Doc. 300,

7 Plaintiff's Opposition p.12.)

8   The policies specifically challenged in this litigation are the policies controlled by the receiver

9 and those set for restructuring and development.  Plaintiff challenges the policies of provision of specific

10 medical care - whether they were established or administered.  Part of the duties of the receiver is the

11 "provide leadership and executive management of the California prison medical health care delivery

12 system with the goals of restructuring day-to-day operations and developing, implementing and

13 validating a new, sustainable system that provides constitutionally adequate medical . . ." (Doc. 44,

14 OAR p.2:11.)  Implementing and altering those policies were suspended by vesting the receiver with the

15 Secretary's powers.  Adopting or implementing policies, at an institutional level, for providing health

16 care would be <u>in</u>consistent with the provision of the receiver's duties.

17   The receiver was appointed in February 14, 2006, prior to plaintiff's injury.  Upon the receiver's

18 appointment, the Secretary's duties as to the provision of medical care were suspended.  It is unnecessary

19 for the Court to determine the full scope of the suspension of the Secretary's duties.  For this case, it is

20 sufficient that plaintiff challenges the policies that were then vested in the receiver.  Indeed, defendants

21 Tilton and Dezember submit undisputed evidence that their duties, as it regards medical care, were taken

22 over by the receiver and they were without authority to implement or adopt policies concerning medical

23 treatment. These are the actions plaintiff challenges.  Focusing on the relevant challenge in this case,

24 these defendants' ability to adopt and implement policies related to pregnant inmates was suspended by

25 the OAR.

26   *In re Estevez* is consistent with this ruling. The warden and the receiver were both proper parties

27 in *Estevez* because of the competing roles they had in the provision of care.  The *Estevez* court

28 acknowledged that the warden, under the receiver, may not have full authority for provision of medical

care: "To the extent that the warden does not have control over an inmate's medical care due to specific restraints imposed by statute or court order, the warden may defer to such party as is legally mandated to provide the requisite care." *Estevez*, 83 Cal.Rptr. at 493.  *In re Estevez* did not challenge the policies adopted and implemented by the Secretary, as does plaintiff's case.  Neither the Secretary of the CDCR nor the Chief Deputy Secretary of the CDCR were named as defendants in *Estevez*.  Rather, the habeas relief challenged the prisoner's specific medical need and whether failure to address that specific need was deliberately indifferent.  *Estevez* is thus consistent with the finding that the duties of the Secretary and the Chief Deputy Secretary to adopt policies and implement medical are policies were suspended.

*Dunn v. Cate* is unpersuasive because plaintiff did not challenge institutional policies, as does plaintiff in this case. The Court characterized plaintiff's claims as "essentially one for failure to provide adequate medical care."  "Plaintiff contends that he did not receive adequate medication and assistive devices for his medical condition."  Unlike the instant case, plaintiff in *Dunn v. Cate* did not challenge the Secretary's adopting and implementing medical policies.

**4.      This Court's Prior Ruling is Consistent with this Determination**

Plaintiff relies upon this Court's prior ruling on motion to dismiss in this case.  The Court ruled on that motion, in part:

> "As the *Estevez* court observed, the *Plata* order does not relieve the state, and in turn the CDC defendants, of constitutional responsibility for determination of adequate inmate medical care.  Moreover, the CDC defendants remain liable for pre-receivership implementation or promulgation of constitutionally deficient policies."

The standard for review in a motion to dismiss is a more lenient standard, than on summary judgment.  On a challenge to the sufficiency of the pleadings on a motion to dismiss, the Court's review is limited.  "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one.  The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheurer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683 (1974).  To survive a motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007).  The Court accepts the truth of the factual allegations and does not delve into the evidence.  Thus, in evaluating a claim, the Court merely

1    considers whether the claim is plausible on its face.

2        On summary judgment, however, Court's inquiry is "whether the evidence presents a sufficient

3    disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as

4    a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.  Plaintiff challenges the very policies

5    which were taken over by the receiver.  Undisputed evidence is submitted that the Secretary and Chief

6    Deputy Secretary were without authority to implement and create medical care policies during the

7    receivership.  No contra evidence is submitted.[5]

8        **5.    Warden Hornbeak**

9        The same cannot be said of Warden Hornbeak.  There is nothing in the *Plata* order which

10   indicates the warden's duties also were suspended.  Indeed, the *Plata* order carefully worded its language

11   directed to the institutional policy making level.  "The Receiver shall exercise all powers vested by law

12   in the Secretary of the CDCR as they relate to the administration, control, management, operation, and

13   financing of the California prison medical health care system. The Secretary's exercise of the above

14   powers is suspended for the duration of the Receivership."  The *Plata* order does not mandate that the

15   Warden's constitutional responsibilities similarly are suspended.

16       The court in *Estevez* noted the tension between the responsibilities of the warden and that of the

17   receiver:

18           "[T]he state, and through its appointed representative the warden, cannot
             abdicate its constitutional responsibility to provide adequate medical care,
19           concomitant with which is the duty to assure said care is not dispensed
             without any regard for the effect on the prison system as a whole. That
20           responsibility is uniquely that of the warden as representative of the state,
             as opposed to being that of the Receiver."  *Estevez,* 83 Cal.Rptr. At 493.
21

22   The Court held that the warden, as well as the receiver, were proper parties in the habeas suit by the

23   _____

24       [5] Plaintiff presents evidence as to the scope of the Secretary's responsibilities for adopting and implementing
     policies. She argues the Secretary had "significant policy-making role," and argues that the *Plata* order states "it is expected,
25   however, that the Secretary shall work closely with the Receiver to facilitate the accomplishment of [the receiver's] duties
     under this Order." (See Doc. 301, Plaintiff Response Facts, facts 10, 13, 14, 16.) Plaintiff argues that the CDCR did not lose
26   all constitutional responsibility for the adequate inmate care or liability for pre-receivership implementation and/or
     promulgation of policies. (See Doc. 301, *id.* ) The Court agrees that CDCR did not lose all of its constitutionally mandated
27   responsibilities for the provision of medical care. However, the Secretary and Chief Deputy Secretary did so for adopting and
     implementing medical care policies.  In this case, that is the conduct that plaintiff challenges: the adopting and
28   implementing medical care policies.

1  prisoner for unconstitutional medical care.  The Court noted that the existence of the receiver does "not

2  relieve the state of its constitutional responsibility to determine whether adequate care is in fact bring

3  provided."

4        Warden Hornbeak testifies as to the scope of her duties.  She is "responsible for the overall

5  operations of VSPW."  (Doc. 278, Hornbeak Decl. ¶2.) Her job duties include "implementing and

6  adopting security and custody policies and procedures, providing programs for the inmate population,

7  and supervising all staff, except medical staff."   She testifies that she did not have authority to

8  implement or adopt policies for medical care or supervise medical staff.  Plaintiff, however, presents

9  evidence that the medical policies are submitted to the Warden annually for final approval, including

10  the policy at issue in this litigation.  (See Doc. 301, Plaintiff's Response Facts, fact 68.)  Thus, the Court

11  finds that, based on this evidence, the *Plata* order and *Estevez*, Warden Hornbeak's duties were not

12  suspended.

13  **D.      Liability of Supervisory Personnel for an "Unconstitutional Policy"**

14        Secretary Tilton, Chief Deputy Secretary Dezember, Warden Hornbeak, Chief Physician Virk

15  and Acting Health Care Manager Martin are sued as individuals.  It is undisputed that these individuals

16  were not personally involved in the care and treatment of plaintiff. Secretary Tilton, Chief Deputy

17  Secretary Dezember, Warden Hornbeak, Chief Physician Virk and Acting Health Care Manager Martin

18  do not face liability for any personal involvement in the deprivation of medical services.[6]

19        Plaintiff argues, however, that these individuals are liable as supervisors.  Plaintiff argues that

20  defendants Tilton, Dezember, Hornbeak, Martin and Virk are sued as Dr. Heinrich's supervisors, in that

21  they failed to provide adequate policies, failed to ensure that their subordinates followed any policies

22  and did not maintain accessible and accurate medical records. (Doc. 167, FAC ¶67, 71.) Plaintiff argues

23  that defendants Tilton, Dezember, Hornbeak, Martin and Virk implemented constitutionally deficient

24  policies for prenatal care and record keeping for treating GBS, an extremely common bacteria which can,

25  and did, have deadly results.  (Doc. 300, Plaintiff's Opposition p.9.)  She argues that they promulgated

26  _____

27        [6] In the prior section, the Court concluded that the responsibilities of Secretary Tilton and Chief Deputy Secretary
Dezember for adopting and implementing medical care policies were suspended by the OAR.  The Court, nonetheless,
addresses plaintiff's allegations as to these two individuals that the policies they adopted and/or implemented violated

28  plaintiff's constitutional right to medical care.

1   or implemented a policy so deficient that the policy was a repudiation of plaintiff's constitutional rights

2   and the moving force of the constitutional violation.[7]  (Doc. 300, Plaintiff's Opposition p.8: 1-18, 16.)

3        **1.      Overview of Supervisor Liability**

4        A supervisory official may be liable under Section 1983 only if he or she was personally involved

5   in the constitutional deprivation, or if there was a sufficient causal connection between the supervisor's

6   wrongful conduct and the constitutional violation. *Redman v. County of San Diego*, 942 F.2d 1435,

7   1446-47 (9th Cir.1991)), *cert. denied,* 502 U.S. 1074 (1992); *Hansen v. Black,* 885 F.2d 642, 646 (9th

8   Cir.1989) (same).  Supervisors can be held liable for (a) their own culpable action or inaction in the

9   training, supervision, or control of subordinates; (b) their acquiescence in the constitutional deprivation

10  of which a complaint is made; or (3) for conduct that showed a reckless or callous indifference to the

11  rights of others. *Cunningham v. Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

12       Under no circumstances, however, is there *respondeat superior* liability under § 1983; that is,

13  there is no liability under § 1983 solely because one is responsible for the actions or omissions of

14  another.  *Redman v. County of San Diego*, 942 F.2d at 1446.  A supervisor therefore generally "is only

15  liable for constitutional violations of his subordinates if the supervisor participated in or directed the

16  violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040,

17  1045 (9th Cir. 1989).

18       **2.      Causation Requirement for Supervisor Liability**

19       The requisite causal connection may be established when an official sets in motion a "series of

20  acts by others which the actor knows or reasonably should know would cause others to inflict"

21

22       [7] Plaintiff appears to argue the Warden Hornbeak also had personally "involvement" because "the evidence indicated
    that [Hornbeak] was aware of the overwhelming and obvious problems that were likely to result in some inmates' profound

23  injuries."  (Doc. 300, Plaintiff's Opposition p. 13-14.)   This argument is insufficient to show Hornbeak's personal
    involvement.  For personal involvement, plaintiff must show that the defendant knew of the risk to plaintiff and deliberately

24  disregarded the risk.  *Estelle v. Gamble*, 429 U.S. at 106 (a person is liable if the person "knows of and disregards an
    excessive risk to inmate health and safety.")  Plaintiff does not come forward with any evidence that Hornbeak knew of

25  plaintiff's medical condition, knew of the medical treatment she was receiving or what care she needed.  Plaintiff argues that
    "As Warden, she was responsible for the 'overall operations' related to prisoners in the prison, and it was obvious to all

26  concerned that failing to have in place a policy" for GBS testing would injure plaintiff.   (Doc. 300, Plaintiff's Opposition
    p. 13-14.)  Plaintiff, however, fails to come forward with evidence that it was "obvious to all concerned" and in particular,

27  obvious and known to Warden Hornbeak.  A defendant must "know of the risk." *Gibson v. County of Washoe, Nevada*, 290
    F.3d 1175, 1187 (9th Cir. 2002) ("If a person should have been aware of the risk, but was not, then the person has not violated

28  the Eighth Amendment, no matter how severe the risk."), *cert. denied*, 537 U.S. 1106 (2003).  Therefore, plaintiff failed to
    raise an issue of fact that Warden Hornbeak is liable on the theory of "personal involvement."

1   constitutional harms. *Preschooler II v. Davis*, 479 F.3d 1175, 1183 (9th Cir.2007) (denying motion to

2   dismiss on allegations that supervisors knew of alleged harm and turned "a blind eye").  For example,

3   supervisory officials may be liable without overt personal participation in the offensive act if they

4   implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the

5   moving force of the constitutional violation." *Redman*, 942 F.2d at 1446-47.  Sweeping conclusory

6   allegations will not suffice to prevent summary judgment.  *Id.*  A supervisor may be liable for an Eighth

7   Amendment violation if he or she was made aware of the problem and failed to act. *Jett v. Penner*, 439

8   F.3d 1091, 1098 (9th Cir. 2006).

9        Plaintiff's evidence does not show that any of the individual supervisors were made aware of

10   plaintiff's medical condition or her care.  Since the supervisors did not "know of the problem and fail

11   to act," the supervisors could only face liability based upon deficient policies.  Thus, the Court turns to

12   whether the policies were so deficient that the policy "itself is a repudiation of constitutional rights" and

13   is "the moving force of the constitutional violation." *Redman*, 942 F.2d at 1446-47.  This "so deficient"

14   standard establishes the requisite causal connection between the injury and the defendant's knowledge.

15   To premise a supervisor's alleged liability on a policy promulgated by the supervisor, plaintiff must

16   identify a specific policy and establish a "direct causal link" between that policy and the alleged

17   constitutional deprivation. *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103

18   L.Ed.2d 412 (1989).

19        **3.       Policies Must be "So Deficient" as to Repudiate Constitutional Rights**

20        The standard for evaluating the supervisor's liability is whether the supervisor implemented a

21   policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving

22   force of the constitutional violation, in this case medical care for pregnancy.

23        Plaintiff contends there is a issue of material fact as to the existence and "adequacy" of the

24   VSPW policy and procedure for medical care of inmates.  (Doc. 300, Plaintiff's Opposition p. 14.)

25   Plaintiff contends there is no written policy for GBS testing.  Plaintiff argues "that the medical care she

26   received was 'inadequate' because she never received routine prenatal care, including GBS testing, in

27   spite of those six visits."  (Doc. 300, Plaintiff's Opposition p. 15.)  She further argues that the prenatal

28   care policy that was in place at VSPW was "deficient" because it did not require the physician or nurse

to reschedule routine appointment when emergent care issues arise." (Doc. 300, Plaintiff's Opposition p. 15.)  She further argues that VSPW failed to have a policy in place that would allow a patient's medical records to be easily accessible by physicians.  Plaintiff argues that Virk and Martin are deliberately indifference for failing to have adequate policies in place. (Doc. 300, Plaintiff's Opposition p. 16-17.)

Here, both the CDCR and the VSPW maintained policies which provided for some care for pregnant inmates and prenatal examinations and laboratory testing.  VSPW maintained a "Pregnant Inmate Care and Birth of Children" Policy, Operational Policy 83080.04.  That policy stated that "[t]he purpose of this procedure is to ensure medical care and custody concerns are met regarding the pregnant inmate population and birth of children at local hospitals." (Doc. 280, Exh.B to Virk Decl. p. 3.) Operations Policy "Pregnant Inmate Care and Birth of Children" also states in relevant part, that a plan of care will be established:

- The initial medical screening of pregnant inmates will be conducted by a Registered Nurse and Medical Technical Assistant in receiving the patient;

- Thereafter, the "Supervising obstetrician or OB Coordinator will be scheduled to determine the term of pregnancy and the plan of care";

- "Pregnant inmates will be issued an "Identified Pregnant Inmate Care";

- "the OB Coordinator will ensure that all subsequent prenatal examination and laboratory tests are conducted by the Obstetrician."

(Doc. 280, Exh.C to Virk Decl. p. 6-7.)  The policy also included standards for maintaining health records:

- When the pregnant inmate is sent for treatment to an outside facility, copies of all prenatal forms will accompany the inmate.

- The OB Coordinator will maintain complete health records reflecting name and Hollister prenatal forms, among other things.

- all documentation regarding the pregnancy-related information will be placed in an orange portfolio inside the health record for easy identification.

1   (Doc. 280, Exh.C to Virk Decl. p. 6-7.)[8]

2        The VSPW Pregnant Inmate Care and Birth of Children  Policy also attaches numerous medical

3   and medical-related forms.  One such form is the "Prenatal Flow Record-Hollister Maternal/Newborn

4   Record System."  (Doc. 280, Exh.C to Virk Decl., attachment J to the policy.)  This form, called the

5   "Hollister Form," includes a box for indicating GBS screening, among other screenings.  The undisputed

6   evidence establishes that the Hollister Form is an adequate means to keep track of tests that needed to

7   be taken.  (Doc. 301, Plaintiff's Response Facts, fact 39.)

8        All parties agree that any "policy" for GBS testing was unwritten.  This "policy" for GBS testing

9   and prenatal care mirrored the standard of care.[9]  The evidence is undisputed that the medical personnel

10  knew GBS testing was within the standard of care and that VSPW attempted to track GBS testing,

11  among other tests, for pregnant inmates, sometimes successfully and on at least one other occasion,

12  unsuccessfully.  In addition, there was undisputed evidence that an additional form was developed at

13  VSPW to supplement the Hollister form and track prenatal testing.  (Doc. 304, Exh. F, Hansen Depo.

14  p.89-1-9.)

15       The CDCR had a separate, written policy, from which VSPW derived its policy, and stated the

16  above contents.  It also provided that pregnant inmates would be scheduled for OB visits:

17       "1.   Within seven (7) business days, the pregnant inmate-patient shall be scheduled for her
              first OB visit wherein a thorough history and examination shall be performed by the
18            Supervising Obstetrician or NP, to determine the term of pregnancy and plan of care.
              **Diagnostic studies shall be ordered based on the information provided in the**
19            **Hollister Maternal/Newborn Record System forms**.

20       "2.   Unless otherwise indicated by the supervising OB or NP, pregnant inmate-patients shall
              be scheduled and educated for their OB visits as follows:
21
              a. Every four (4) weeks in the first trimester and up to 24-26 weeks gestation
22

23  _____

24       [8] Plaintiff argues that there is an issue of fact as to whether Operational Policy 83080.04 was in use at VSPW in 2007
    because Dr. Virk did not produce the policy during discovery.  (Doc. 311, Plaintiff's Disputed Facts, fact 6.)  Plaintiff,
25  however, does not support this argument with evidence.  She neither presents evidence to support whether Dr. Virk produced
    the policy, nor produces evidence of whether the policy was in effect in August 2007.  Indeed, throughout this motion and
26  her opposition, the evidence submitted and addressed by all parties is that VSPW, in fact, had in effect Operational Policy
    83080.04.  (See e.g., Doc. 300, Plaintiff's Opposition p.15.)  Plaintiff is not entitled to an inference that the policy was not
    in use when she relies on that very policy as the source of the "unconstitutional policy."
27
         [9] Plaintiff objects that the policy - as implemented - followed the standard of care, but does not dispute that a policy
28  mirrored the standard of care.  (See Doc. 301, Plaintiff's Response Fact, 30, 31.)

b. Every three (3) weeks up to 30 weeks gestation

c. Every two (2) weeks up to 36 weeks gestation

d. Weekly after 36 weeks gestation up to delivery." (Doc. 280, Exh. C to Virk Decl. p.4-24-2) (emphasis added.)

These policies show an effort to ensure medical treatment of pregnant inmates and a lack of deliberate indifference.  There is no evidence that these policies are so deficient that they fail to address relevant medical needs.  Rather, plaintiff's near entire argument rests upon what the policies did not include: they did not include a specific policy for GBS testing.[10]

The Court has been unable to locate, and the parties have not cited to any authority, which analyzes whether a policy is "so deficient that the policy itself is a repudiation of constitutional rights" for failure to include a specific item, such as medical testing.  *Redman v. County of San Diego*, however, provides some guidance.  In *Redman*, a prisoner brought a 42 U.S.C. § 1983 claim against prison officials and the county for violations of his personal security interests.  *Redman*, 942 F.2d at 1439. Plaintiff had been sexually assaulted by other inmates while detained in jail.  *Id.* at 1438.  He alleged that policies integrating violent homosexuals insufficiently protected prisoners, and that officials were directly liable under a theory of supervisory liability.  *Id.* at 1439.  Plaintiff alleged that the policy permitted jail overcrowding, and continued operation despite overcrowding.  The overcrowding prevented the officials from segregating violent prisoners, which would be the normal practice, and instead they moved violent homosexuals into the general population and "hoped for the best." The court found that, because individual jail officers had adopted policies with integrated potentially sexually violate prisoners, they potentially  "developed and implemented policies that were deliberately indifferent to Redman's personal security and were a moving force in the violation of his constitutional rights" *Id.* at 1448.  The Court stated that, drawing all reasonable inferences in favor of plaintiff, the

---

[10] Plaintiff presents evidence that these policies fell below the standard of care for GBS testing, which is an entirely different standard than "deliberate indifference."  Dr. Cardwell, plaintiff's medical expert, testifies that "VSPW did not have a policy, as implemented, that followed the standard of care for GBS testing." (Doc. 302, Cardwell Decl. ¶21.) Dr. Cardwell also states that the "national standard of care also requires that hospitals always obtain and preview prenatal records and laboratory testing results for a patient, regardless of whether the visit is acute or routine." (Doc. 302, Cardwell Decl. ¶22.) He does not testify as to whether these policies are so deficient that they demonstrate indifference to medical care. Accordingly, Dr. Cardwell's this testimony does not raise an issue of fact as to whether the policies are so deficient as to be deliberate indifference.

1  officials knew of overcrowding, knew of the danger, developed policies which exposed plaintiff to

2  known dangers, and thus, "their conduct was so reckless as to be tantamount to a desire to inflict harm."

3  *Id.* at 1447- 48.  The court reversed the directed verdict on behalf of the individuals.

4          Here, in contrast, some form of policies was in place which provided for medical care for

5  pregnant inmates.  Neither the CDCR policy nor the VSPW policy provides specifically for GBS testing,

6  per se.  However, the evidence is undisputed that all medical personnel recognized the need for GBS

7  testing, among various other forms of prenatal testing and care.  The evidence is undisputed that GBS

8  testing was within the considerations of the policy language of "diagnostic test" and prenatal tests.  (See

9  e.g., Doc. 301, Plaintiff Response Facts, fact 23, 24.)  Indeed, VSPW personnel developed a "check off"

10  form that tracked the care and tests given an inmate, including GBS testing.[11]  It is undisputed the "check

11  off" form was in plaintiff's medical chart (even if the GBS testing was left blank).  It was acknowledged

12  by all persons that GBS testing was a goal to be achieved for all pregnant inmates.  No evidence has been

13  introduced that VSPW deliberately refused to test a pregnant inmate or deliberately disregarded the need

14  to test a pregnant inmate.  The existence of the standardized form which checked off prenatal testing,

15  among other things, is further reflective of a custodial concern for inmates welfare.  Failure to include

16  such testing in VSPW's medical policy is not deliberate indifference when the need was recognized and

17  some form of procedures implemented to address the need.

18           Plaintiff does not cite to any authority for the proposition that a policy which fails to include a

19  specific form of testing is "deliberate indifference."  There is no authority, and no evidence, that a

20  medical policy must state a level of detail for each specific prenatal testing requirement necessary to

21  ensure healthy delivery of a child.  There are dozens, if not hundreds, of considerations, variations, and

22  permutations which would need to considered and determined to conform to the constitutional standard

23  that plaintiff proposes.  *See generally*, *Whitley v. Albers*, 475 U.S. 312, 321-22, 106 S.Ct. 1078, 89

24  L.Ed.2d 251 (1986) (prison administrators should be accorded wide-ranging deference in the adoption

25  and execution of policies and practices that in their judgment, are necessary to preserve internal order

26  and discipline, and to maintain institutional security).

27  _____

28          [11] At one time, VSPW employed a medical assistant whose responsibility was to tract pregnant inmate care, including various testing.

It is important to emphasize that the Court is considering the standard of "deliberate indifference," not medical malpractice.  The medical standard of care may require a specific policy for each testing but at constitutional level, a supervisor is not deliberately indifferent, under these facts, for failing to include a specific policy for GBS testing.  Failure to state GBS testing within the VSPW's medical policy was not deliberate indifference to plaintiff's medical need.

Plaintiff argues that whatever the policies were, they were not implemented.  Again, the evidence shows that the medical personnel recognized that GBS testing was to be performed, and the evidence shows that the doctors and supervisors attempted to provide the care within the standard of care.  That they failed to provide medical standardized care does not equate to deliberate indifference.  No issue of fact is raised that any of the individual defendants acted "so reckless as to be tantamount to a desire to inflict harm."  The evidence fails to raise an issue of fact that the deliberate conduct of the medical personnel was to NOT provide standardized care.

**4.     Non-Medical Supervisors**

Plaintiff seeks to impose supervisor liability upon the <u>non</u>-medical supervisors - Tilton, Dezember, Hornbeak, for medical policies.

Plaintiff must still establish that a supervisor knew of the problem, knew of the need, yet established policies which were "so deficient" as to be deliberately indifferent to the prisoners medical care. In *Redman*, there was evidence that the supervisors knew of the overcrowding and knew of the release of violent inmates into the general population.  Thus, in *Redman*, there was evidence that the supervisor knew of the problem, knew of the need, yet implemented policies that disregarded the potential of harm.

Here, plaintiff does not introduce evidence that these individuals knew there was a problem of GBS testing and knew of the need, yet disregarded that problem and need.  Rather, plaintiff relies upon generalized evidence as follows:

-     Tilton was the Secretary of the CDCR, who was responsible for the overall operation and direction of the state prisons.  (Doc. 303, Plaintiff's Disputed facts, fact 27, 28.) Tilton knew that prisoners were not receiving adequate medical care, citing to *Coleman v. Schwarzenegger,* 2009 WL 2430820.  (Doc. 303, Plaintiff's Disputed facts, fact 31.)

1      -    Dezember was the Chief Deputy Secretary and responsible for implementing and

2            promulgating policies for medical care in the prisons.  (Doc. 303, Plaintiff's Disputed

3            facts, fact 29, 30.)

4      -    Hornbeak was the warden of VSPW and responsible for the overall supervision of the

5            prison and responsible for reviewing and approving all policies.  (Doc. 303, Plaintiff's

6            Disputed facts, fact 50, 51.)

7        Plaintiff has failed to establish a causal connection between these defendants and plaintiff's

8  injuries.  Plaintiff cannot assert a claim for damages against defendant Tilton, Dezember and Hornbeak

9  based simply on proof that they are aware of systemwide problems faced by California's prisons and have

10  failed to rectify them.  *See e.g.*, *Carrea v. California*, 2009 WL 1770130, 7 (C.D.Cal. 2009) ("The

11  connection between defendants' alleged derelictions and plaintiff's specific injuries is too remote to

12  support their liability for damages.)  The evidence relied upon is nothing more than *respondeat superior:*

13  The supervisor was in a position to know, should have known and should have corrected.  Plaintiff,

14  however, must establish the "causation" component.    The inquiry into causation "must be

15  individualized" and focused on the duties and responsibilities of the individual defendant whose acts or

16  omissions are alleged to have caused a violation.  *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988).

17  Where a plaintiff seeks damages against the individual, "[w]e must focus on whether the individual

18  defendant was in a position to take steps to avert the [incident], but failed to do so intentionally or with

19  deliberate indifference."  *Leer*, 844 F.2d at 634.  Plaintiff cannot hold these defendants individually

20  liable for damages merely by showing that, because of high-profile litigation or for other similar reasons,

21  they must be aware of the prison conditions of which plaintiff complains.  *Carrea v. California,* 2009

22  WL 1770130, at 6 ("It does not follow, however, that the Governor of California and the Secretary of

23  the CDCR are ipso facto liable for monetary damages any time a California prisoner receives inadequate

24  medical care."); *see e.g.*, *Spruill v. Gillis*, 372 F.3d 218, 236 (3rd Cir. 2004) (non-physician defendants

25  cannot "be considered deliberately indifferent simply because they failed to respond directly to the

26  medical complaints of a prisoner who was already being treated by the prison doctor" and if "a prisoner

27  is under the care of medical experts ... a non-medical prison official will generally be justified in

28  believing that the prisoner is in capable hands.")   There is no evidence that these individuals had any

1  involvement in the application of the policy to plaintiff.

2  **E.**    **Deliberate Indifference of Heinrich**

3        Plaintiff contends that Dr. Heinrich was deliberately indifferent to her medical needs because he

4  failed to provide her with standard prenatal care, failed to have her medical records accessible, and failed

5  to test her during the relevant time period for GBS.  (Doc. 167, FAC ¶67.)

6        Dr. Heinrich argues that he routinely cared for plaintiff during her pregnancy and treated her

7  various ailments.  He "did not ignore plaintiff's medical needs and his failure to test her for GBS does

8  not amount to a constitutional violation."  (Doc. 275, Moving P&A p.14-15.)  Dr. Heinrich argues that

9  at most, his failure to test plaintiff for GBS was negligent, which is insufficient for a constitutional

10  violation.[12]

11        **1.**    **Evidence of the Medical Care Provided by Dr. Heinrich**

12        The evidence submitted by Defendants shows that Dr. Heinrich saw and examined plaintiff on

13  multiple occasions.  Dr. Heinrich cared for plaintiff during her pregnancy in various ways.  Indeed, on

14  the day she was received into VSPW, Dr. Heinrich examined plaintiff.  It is undisputed that he treated

15  her for her immediate concerns and performed some fetal monitoring.  She was sent to MCH on August

16  4, 2007 to address her pre-labor complaints.  She was seen at the VSPW clinic or the Triage and

17  Treatment Area on August 9, 10, 12, 17, 20, 21, 22, 23, 24, and 26.  Of these visits, the evidence

18  establishes that Dr. Heinrich saw plaintiff on August 10, 17, 20, 21, 22.  Dr. Heinrich addressed her

19  immediate concerns and rendered care to her, such as checking her cervix, taking the baby's

20  measurements, prescribing pain medication, and monitoring the baby's heart beat.[13]  Dr. Heinrich sent

21  plaintiff to MCH for treatment and possible delivery on August 4, 20, 21, and 26.  There is no evidence

22  that Dr. Heinrich failed to address her complaints when he saw her or when he was contacted about her.

23

24        [12] Dr. Heinrich has admitted that he committed medical malpractice for failing to test plaintiff.  He admits that plaintiff was at VSPW during the 35-37 weeks of her pregnancy, and she should have been tested for GBS, but was not. (Doc. 305, Finley Decl., Exh. W "Stipulation".)  His admission, however, does not establish his deliberate indifference. Mere malpractice does not constitute deliberate indifference.  *Estelle,* 429 U.S. at 106.

25

26        [13] While plaintiff objects to some of the evidence (to the extent that it implies "normal prenatal examinations" or "GBS testing"), the evidence is undisputed that Dr. Heinrich saw plaintiff on the day she arrived at VSPW and he performed the medical examinations.  Plaintiff does not dispute that he provided the medical care as stated in her medical records. Defendants do not argue any inference from the medical records that GBS testing was performed and the Court does not make any such inference. No defendant, of course, contends that Dr. Heinrich tested plaintiff for GBS.

27

28

The evidence is undisputed that plaintiff was promptly seen whenever she came to the clinic and that Dr. Heinrich promptly sent her to MCH on multiple occasions for further treatment and care, when his medical judgment determined the occasions warranted. Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference. *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995). The evidence is undisputed that plaintiff was provided care for her medical condition. Dr. Heinrich provided some, if not all necessary, prenatal care for her pregnancy. The medical records and evidence show that plaintiff's complaints were addressed, diagnoses made, and medications prescribed. She was examined when she presented with a complaint. No evidence has been provided that plaintiff's complaints were ignored or that plaintiff was refused treatment. *Cf. Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir.1989) (summary judgment reversed where medical staff and doctor knew of head injury, disregarded evidence of complications to which they had been specifically alerted and, without examination, prescribed contraindicated sedatives).

Further, there is no evidence that Dr. Heinrich was wilfully ignorant of the lack of GBS testing for plaintiff. Dr. Heinrich and Nurse Hanson had devised a prenatal test sheet which could be checked off as the prenatal testing had been completed. The check off sheet was being used and was, in fact, in plaintiff's medical file. The check off sheet contained a place to check off the GBS testing, even though it was not checked off. Plaintiff has not presented evidence that Dr. Heinrich knew that the GBS testing had not been checked off and disregarded that lack of testing.

## 2. "Should Have" Known

Plaintiff argues that Heinrich <u>should</u> have known of the risk, and offers circumstantial evidence that he should have known of the risk. Plaintiff argues that Dr. Heinrich <u>should have known</u> there was a substantial risk to plaintiff's health for not performing the GBS testing.

Deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm. *Lolli v. County of Orange*, 351 F.3d at 421; *Gibson,* 290 F.3d at 1197 (acknowledging that a plaintiff may demonstrate that officers "must have known" of a risk of harm by showing the obvious and extreme nature of a detainee's behavior). "[U]sing circumstantial evidence to prove deliberate indifference requires more than evidence that the defendants should have recognized the excessive risk and responded to it; it requires evidence

that the defendant must have recognized the excessive risk and ignored it." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 138 (3d Cir.2001).

Here, the circumstantial evidence does not raise an issue of fact as to Dr. Heinrich's deliberate indifference.  It is undisputed that Dr. Heinrich knew the standard of care was that a pregnant woman should be tested for GBS during the relevant time.  It is undisputed that Dr. Heinrich failed to test her. But the evidence equally <u>fails to show that Dr. Heinrich knew plaintiff had not been tested and chose not to test her</u>.  Here, even the circumstantial evidence does not show Dr. Heinrich knew she was untested.  *Gibson*, 290 F.3d at 1187-88 (Even if a person should have been aware of the risk, but was not, the person was not in violation of the Eighth Amendment.)

Plaintiff argues that Dr. Heinrich did not call for her medical records or that the records were unavailable when she was seen at the clinic and she was not regularly scheduled for "routine prenatal examinations." (See e.g., Doc. 301, Plaintiff's Response Facts, Facts 45-46.)  There is no evidence that Dr. Heinrich refused to obtain her medical records. (See Doc. 300, Plaintiff's Opposition p.20:3-6 ("Heinrich was aware that he may not even see the forms because it could take 'several hours' to retrieve a patient's chart and that, therefore, a patient's chart may not be retrieved during an acute or unscheduled visit.")).  But, failure to obtain inmate's records is not deliberate indifference.  *Wood v. Housewright,* 900 F.2d 1332, 1334 (9th Cir. 1990) (failure to provide the inmate's medical records when he arrived at the prison is not deliberate indifference).

Further, there is no evidence that Dr. Heinrich refused to schedule plaintiff for prenatal examinations.  The evidence shows that Dr. Heinrich and Nurse Hanson "failed" to schedule regular appointments.  At most, this is negligence and not deliberate indifference.  The evidence establishes that plaintiff was treated on the acute, as needed basis for complaints which arose during her pregnancy.  She was seen at the VSPW and treated.  The evidence does not show that she was denied treatment.  The evidence does not show that she was delayed in treatment.  The evidences does not show that Dr. Heinrich intentionally ignored medical treatment. Prison officials are deliberately indifferent to a prisoner's serious medical needs when they "deny, delay or intentionally interfere with medical treatment." *Wood v. Housewright*,  900 F.2d at 1334.

Plaintiff has failed to adduce any evidence to lead a reasonable juror to infer the Dr. Heinrich had

knowledge that plaintiff had not been tested for GBS, or willfully blinded himself to this fact, and deliberately chose not to test her. *Farmer*, 511 U.S. at 838-842, 114 S.Ct. at 1979-1981 (It is nothing less than recklessness in the criminal sense-subjective standard-disregard of a risk of harm of which the actor is actually aware.)  Here, the plaintiff's medical records and the undisputed evidence before this Court document the assessments and treatment for plaintiff's pregnancy.

Plaintiff challenges that Dr. Heinrich should have done more, he knew to do more and failed to do more.  Whether Dr. Heinrich could have done more, should have done more and simply failed to do more is merely a standard for showing medical malpractice.  "Adequacy of conduct" is not the standard for deliberate indifference.  Plaintiff attempts to blur the line between medical malpractice, or even gross malpractice, with the line established by the Supreme Court for deliberate, determined indifference.

In sum, Plaintiff has failed to show a purposeful act or purposeful failure to act on the part of Dr. Heinrich which resulted in harm. *See McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.1992) (per curiam) (noting that deliberate indifference requires a purposeful failure to respond to a prisoner's medical needs, and that negligence in diagnosing or treating a medical condition, or even medical malpractice, does not amount to a violation of a prisoner's Eighth Amendment rights), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc).  While poor medical treatment will at a certain point rise to the level of constitutional violation, mere malpractice, or even gross negligence, does not suffice. *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (Although Wood's treatment was not as prompt or efficient as a free citizen might hope to receive, Wood was given medical care at the prison that addressed his needs.)  Consequently, Dr. Heinrich cannot, as a matter of law, be liable under the Eighth Amendment.

**F.      Qualified Immunity**

Defendants argue that they are entitled to qualified immunity.  They argue that they did not violate plaintiffs' Eighth Amendment rights.  Tilton, Dezember, and Hornbeak had no power, or reasonably believed they had no power, to make decisions about the medical treatment of inmates; Martin and Virk had policies and procedures in place for treating pregnant inmates and had no knowledge that they were allegedly not being followed; and Heinrich never refused to see or treat Plaintiff.

1    "Government officials enjoy qualified immunity from civil damages unless their conduct violates

2    'clearly established statutory or constitutional rights of which a reasonable person would have known.'"

3    *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir.2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818,

4    102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). When a court is presented with a qualified immunity defense,

5    the central questions for the court are (1) whether the facts alleged, taken in the light most favorable to

6    the plaintiff, demonstrate that the defendant's conduct violated a statutory or constitutional right and (2)

7    whether the right at issue was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151,

8    150 L.Ed.2d 272 (2001).

9    Although the court was once required to answer these questions in order, the United States

10   Supreme Court has recently held that "while the sequence set forth there is often appropriate, it should

11   no longer be regarded as mandatory." *Pearson v. Callahan*, --- U.S. ----, ----, 129 S.Ct. 808, 818, 172

12   L.Ed.2d 565 (2009). In this regard, if a court decides that plaintiff's allegations do not make out a

13   statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified

14   immunity." Saucier, 533 U.S. at 201. Likewise, if a court determines that the right at issue was not

15   clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries

16   concerning qualified immunity at that point without determining whether the allegations in fact make

17   out a statutory or constitutional violation. Pearson, 129 S.Ct. at 818-21.

18   In deciding whether the plaintiff's rights were clearly established, "[t]he proper inquiry focuses

19   on whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he

20   confronted' ... or whether the state of the law [at the relevant time] gave 'fair warning' to the officials

21   that their conduct was unconstitutional." *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir.2002) (quoting

22   *Saucier*, 533 U.S. at 202). The inquiry must be undertaken in light of the specific context of the case.

23   *Saucier*, 533 U.S. at 201. Because qualified immunity is an affirmative defense, the burden of proof

24   initially lies with the official asserting the defense. *Harlow*, 457 U.S. at 812; *Houghton v. South*, 965

25   F.2d 1532, 1536 (9th Cir.1992); *Benigni v. City of Hemet*, 879 F.2d 473, 479 (9th Cir.1989).

26   Viewed in the light most favorable to Plaintiff, and because of the findings above, defendants

27   prevail as a matter of law on their qualified immunity defense because the evidence does not establish

28   an Eighth Amendment violation. *See Harlow*, 457 U.S. at 818. However, even if a constitutional

30

violation had occurred with respect to Plaintiff's claim of deliberate indifference to her serious medical needs, in light of clearly established principles at the time of the incident, Defendants could have reasonably believed their conduct was lawful.

## G.     Eleventh Amendment and Mootness

Defendants contend that the Eleventh Amendment bars the claims against the defendants in their "official capacities." Defendants argue that plaintiff's official capacity claim for injunctive relief is moot because no policy or procedure is at issue that can adversely affect plaintiff because she is no longer incarcerated. (Doc. 275, Defendants P&S p. 16.) Defendants argue that because plaintiff is not entitled to prospective relief, her injunctive relief claim is moot.

The Eleventh Amendment prohibits §1983 suits against states. *Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Ass'n,* 450 U.S. 147, 149-150 (1981). The suit against the state officials in their official capacities is nothing more than an attempt to recover damages from the state, and is thus barred by the Eleventh Amendment. *Kentucky v. Graham,* 473 U.S. 159, 164-66 (1985); *Edelman v. Jordan,* 415 U.S. 651, 675-678 (1974). *See also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) (applying this principle to actions under § 1983 in state court).

Here, plaintiff alleges both an "official capacity" suit and an individual suit against the individuals. When a complaint alleges that the officers were acting "within the course and scope" of their government employment, official capacity is alleged. *Bair v. Krug*, 853 F.2d 672, 675 (9th Cir. 1988); *Blaylock v. Schwinden*, 862 F.2d 1352, 1354 (9th Cir. 1988). Plaintiff alleges that the CDCR defendants and the VSPW defendants were "each the agent, servant and employee of each other, and these Defendants were acting within the course and scope of said agency and employment with knowledge and consent of each employer and principal." (Doc. 167, FAC ¶16.) Thus, the liability is sought against the individuals in their official capacities, in addition to their individual capacities.

Plaintiff argues that the Eleventh Amendment does not bar her "official capacity" claim because she seeks prospective relief. She argues that pursuant to the *Ex Parte Young* doctrine, she is entitled to pursue a suit to enjoin state officials from violating federal law. She argues under the *Ex Parte Young* doctrine she is entitled to seek prospective relief against the defendants to implement adequate policies for future inmates. She argues she "seeks injunctive relief requiring the Defendants to implement

adequate policies to ensure that this tragedy does not happen to any other inmate." (Doc. 300, Plaintiff's Opposition p.21:26-28.)

Suits against state officials to enjoin them from continuing to enforce allegedly unconstitutional state laws are not deemed against the state, and hence are not barred by the Eleventh Amendment. *Ex Parte Young*, 209 U.S. 123, 166, 28 S.Ct. 441, 456 (1908). The *Ex Parte Young* doctrine applies only to "ongoing and continuous" violations of federal law; a plaintiff may not use the doctrine to adjudicate the legality of past conduct. *Papasan v. Allain*, 478 U.S. 265, 277–278, 106 S.Ct. 2932, 2940 (1986).

Defendant argues that any injunction would be moot because plaintiff is no longer in custody and an injunction would not benefit her. Plaintiff admits that any such new policy or procedure will not affect plaintiff because she is no longer incarcerated. (Doc. 300, Plaintiff's Opposition p. 21:3-4.) Plaintiff argues that she "may" return to prison because she has been incarcerated before on "more than one occasion." (Doc. 300, Plaintiff's Opposition p.22.) She argues that the conduct is "capable of repetition, yet evading review" and thus entitled to prospective relief, citing *Murphy v. Hunt,* 455 U.S. 478, 482 (1982)

A federal court has no authority to give opinions upon moot questions. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 1068 (1997). Although a suit for injunctive relief is normally moot upon the termination of the conduct at issue, such a claim is not moot if there is a likelihood of recurrence. *Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004), *cert. denied,* 545 U.S. 1139 (2005). A case is not moot when (1) the duration of the challenged action is too short to be litigated prior to cessation, and (2) there is a "reasonable expectation" that the same parties will be subjected to the same offending conduct. *Murphy v. Hunt,* 455 U.S. 478, 482 (1982). Where plaintiff seeks prospective injunctive relief, any threatened future injury must be real and immediate, not conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992); *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (plaintiff must show threatened injury is "actual or imminent" and "concrete and particularized.")

This Court finds that plaintiff's claim for injunctive relief is moot. She has not shown that there is a "reasonable expectation" that she will be subjected to the same offending conduct. Plaintiff is no longer incarcerated. She argues that she may possibly return, but the "possibility" that plaintiff may

return to VSPW is insufficient to establish a "reasonable expectation" that she may be subject to the same offending conduct.  Plaintiff's argument is no more than mere speculation.  Further, plaintiff does not argue any point about the "possibility" or improbability that plaintiff will be pregnant upon her speculative return to prison.  Accordingly, as there is no reasonable expectation that she will be subjected to the "same offending conduct," this Court finds her claim for prospective injunctive relief moot.  The claims against the individual CDCR defendants and the VSPW defendants, in their official capacities, are dismissed.[14]

### CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment, or in the alternative, motion for summary adjudication as follows:

1.   GRANTS the motion on the First Cause of Action for Deliberate Indifference pursuant to 42 U.S.C. §1983 as to defendant Tilton and defendant Dezember.

2.   GRANTS the motion on the Second Cause of Action for Deliberate Indifference pursuant to 42 U.S.C. §1983 as to defendants Hornbeak, Dr. Martin, Dr. Virk and Dr. Heinrich.

3.   GRANTS the motion for qualified immunity.

4.   GRANTS the motion on the request for injunctive relief.

IT IS SO ORDERED.

Dated:     **March 31, 2010**              /s/ Lawrence J. O'Neill
                                    UNITED STATES DISTRICT JUDGE

---

[14] Plaintiff does not show how her purported class-type claims for prospective injunctive relief could possibly proceed in light of *Plata v. Schwarzenegger* class action challenging constitutional adequacy of medical care.